## UNITED STATES v. GRAND RAPIDS & I. RY. CO.

### (Circuit Court of Appeals, Sixth Circuit. June 30, 1915.)

### No. 2536.

1. COMMERCE &⟶58—REGULATION OF HOURS OF SERVICE—VALIDITY.

Hours of Service Act March 4, 1907, c. 2939, 34 Stat. 1415 (Comp. St. 1913, §§ 8677–8680), limiting the hours of service of employés of carriers engaged by railroad in interstate commerce, is within the power of Congress to enact.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 77–86, 100; Dec. Dig. &⟶58.]

2. MASTER AND SERVANT &⟶13—REGULATION OF HOURS OF SERVICE—VALIDITY.

The purpose of Congress in enacting the Hours of Service Act, limiting the hours of service of employés of carriers by railroad engaged in interstate commerce, is to deal with all telegraph offices through which interstate train orders are transmitted.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. &⟶13.]

3. MASTER AND SERVANT &⟶13—REGULATIONS—HOURS· OF SERVICE—STATUTES—CONSTRUCTION.

The statutory limits of service which can be exacted of a telegraph operator within a 24-hour period, as prescribed by the Hours of Service Act, must be observed; and a railroad company may not so dispose of hours of work as to require service by operators in excess of the statutory limit, notwithstanding ample resting intervals are in the company's opinion provided for.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14: Dec. Dig. &⟶13.]

4. MASTER AND SERVANT &⟶13—REGULATION OF EMPLOYMENT—HOURS OF SERVICE—TELEGRAPH OFFICES.

A telegraph office in charge of one operator from 4:30 a. m. to 6 a. m., from 7 a. m. to 11 a. m., and from 12 m. to 5 p. m., while another operator serves from 12 m. to 9:30 p. m., and a telegraph office in charge of one operator from 6:30 a. m. to 12 m., and from 1 p. m. to 6 p. m., and in charge of another operator from 11 a. m. to 1 p. m., and from 2 p. m. to 5 p. m. and 6 p. m. to 11 p. m., are offices within the Hours of Service Act, limiting the hours of service of employés, and providing that no operator, who by the use of the telegraph, reports, transmits, receives, or delivers orders pertaining to or affecting interstate train movements, shall be permitted to be or remain on duty for a longer period than 9 hours, etc., in offices continuously operated night and day, nor for a longer period than 13 hours in offices operated only during the daytime.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. &⟶13.]

5. CONSTITUTIONAL LAW &⟶238—EQUAL PROTECTION OF LAW—CLASSIFICATION.

The Hours of Service Act, classifying telegraph offices into two classes, one class composed of offices continuously operated night and day, and another class composed of offices operated only during the daytime, and declaring that no operator shall be permitted to remain on duty for more than 9 hours in any 24-hour period in night and day offices, nor for more than 13 hours in daytime offices, provides for a classification which is reasonable and valid.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 688–690, 695, 706–708; Dec. Dig. &⟶238.]

&⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

6. MASTER AND SERVANT ☞13—REGULATION OF EMPLOYMENT—HOURS OF SERVICE—STATUTORY PROVISIONS—"CONTINUOUSLY."

A telegraph office operated from 4:30 a. m. to 9:30 p. m., subject to negligible intermissions and a telegraph office operated from 6:30 a. m. to 11 p. m. subject to negligible intermissions, are not offices operated only during the daytime, but are offices operated during the day and night, within Hours of Service Act limiting the hours of service of employés, and declaring that no operator reporting, transmitting, receiving, or delivering train orders shall be permitted to remain on duty for more than 9 hours in any 24-hour period in offices continuously operated night and day, nor for more than 13 hours in offices operated only during the daytime, for the words "only" and "continuously" must be read in connection with their respective classes, and as descriptive of conditions recurring and demanding day service on the one hand, and night and day service on the other, and offices are "continuously" operated night and day whenever the same or similar and substantial lengths of service recur therein regularly every day and night for a series of successive 24-hour periods, even though the offices are not operated continuously during every hour from midnight to midnight.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ☞13.

For other definitions, see Words and Phrases, First and Second Series, Continuous.]

7. MASTER AND SERVANT ☞13—REGULATION—HOURS OF SERVICE—STATUTES—CONSTRUCTION.

The Hours of Service Act, limiting the hours of service of employés of carriers by railroad in interstate commerce, though enforceable through penalties will not be construed so strictly as to defeat the obvious intention of Congress to promote the safety of employés and travelers on railroads.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ☞13.

Hours of service of employés, see note to United States v. Houston Belt & T. Ry. Co., 125 C. C. A. 485.]

In Error to the District Court of the United States for the Western District of Michigan; Clarence W. Sessions, Judge.

Actions by the United States of America against the Grand Rapids & Indiana Railway Company, in which there was a judgment for defendant, and the United States brings error. Reversed and remanded for further proceedings.

P. J. Doherty, of Washington, D. C., and Myron H. Walker, U. S. Atty., of Grand Rapids, Mich., for the United States.

J. H. Campbell, of Grand Rapids, Mich., for defendant in error.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

WARRINGTON, Circuit Judge. The government commenced two actions of a civil nature against the railroad company to recover penalties amounting to $60,000, for alleged violations of the federal statute commonly known as the Hours of Service Act (34 Stat. 1415). A plea of the general issue was filed to each declaration. The actions appear to have been submitted as a single cause by consent of counsel and upon an agreed statement of facts. An instructed verdict was rendered in favor of defendant, judgment was entered accordingly, and the government prosecutes error.

The services in question were rendered during the month of September, 1911, in two telegraph offices maintained by the defendant, one at Pellston and the other at Traverse City, Mich., for purposes, among others, of there receiving and delivering interstate train orders. Two telegraph operators were employed in each office. Defendant's main line extends from Mackinaw City, its northern terminus, through Pellston, some 18 miles southwardly, and to Ft. Wayne, Ind., with a branch line connecting with the main line at Walton Junction and extending a distance of 26 miles to Traverse City. Admittedly the service imposed upon each of the operators in every 24-hour period of the month in issue exceeded 9 hours. At Traverse City, one of the operators was on duty from 4:30 a. m. to 6 a. m., from 7 a. m. to 11 a. m., and from 12 m. to 5 p. m., a total of 10½ hours; and the other operator served from 12 m. to 9:30 p. m., or 9½ hours. It will be observed that the service of both operators was simultaneous from 12 m. to 5 p. m., or 5 hours, though neither was on duty from 6 a. m. to 7 a. m., nor from 11 a. m. to 12 m.; and the office was closed every night from 9:30 p. m. to 4:30 a. m., or 7 hours. At Pellston, during every 24-hour period, one of the operators worked from 6:30 a. m. to 12 m., and from 1 p. m. to 6 p. m., or 10½ hours; and the other operator worked from 11 a. m. to 1 p. m., from 2 p. m. to 5 p. m., and from 6 p. m. to 11 p. m., in all 10 hours. Here both operators were on duty regularly from 11 a. m. to 12 m. and from 2 p. m. to 5 p. m., in all 4 hours; and the office was closed every night from 11 p. m. to 6:30 a. m., or 7½ hours.

[1, 2] Counsel in effect agree that the case must turn upon the single question, whether the places of service were "night and day" offices; but the arguments lead also to an inquiry into what are "daytime" offices. The question involves an application of the phrase "offices  *  *  *  continuously operated night and day," [1] to the particular hours and the length of service stated. The words quoted have been judicially considered a number of times, and still their meaning, when applied to the facts above pointed out, is by no means settled. There are, however, at least two settled features of the statute, which are helpful here. One is that the enactment of the law was within the constitutional power of Congress (Balt. & Ohio R. R. v. Int. Com. Comm., 221 U. S. 612, 31 Sup. Ct. 621, 55 L. Ed. 878), and the other is that the legislative purpose was to deal with all telegraph offices through which interstate train orders are transmitted (United States v. Atchison, T. & S. F. Ry. Co., 220 U. S. 37, 31 Sup. Ct. 362, 55 L. Ed. 361).

[3] 1. Much is said in argument touching the right of a railroad company in many instances so to dispose the hours of work as justly to require services on the part of each of its telegraph operators in excess of 9 hours in the course of each 24-hour period. The theory is that the character and extent of the work arising in some of the offices, especially in interstate train dispatching, admit alike of such excess in length of service and ample resting intervals for the operators. The effect of this insistence, as it seems to us, is to substitute the judg-

---

[1] These words are hereafter set out with their context.

ment of the railroad companies for that of Congress; and if such a practice can be indulged in at all, it is not easy to perceive where legislation is to end and observance of the legislative enactment is to begin. Mr. Justice Hughes said in the Baltimore & Ohio Railroad Case, supra, at page 619 of 221 U. S., at page 625 of 31 Sup. Ct. (55 L. Ed. 878):

"The length of hours of service has direct relation to the efficiency of the human agencies upon which protection to life and property necessarily depends. * * * In its power suitably to provide for the safety of employés and travelers, Congress was not limited to the enactment of laws relating to mechanical appliances; but it was also competent to consider, and to endeavor to reduce, the dangers incident to the strain of excessive hours of duty on the part of * * * telegraphers, and other persons embraced within the class defined by the act. * * * If, then, it be assumed, as it must be, that in the furtherance of its purpose Congress can limit the hours of labor of employés engaged in interstate transportation, it follows that this power cannot be defeated either by prolonging the period of service through other requirements of the carriers or by the commingling of duties relating to interstate and intrastate operations."

We may therefore safely assume that the statutory limits of service, which can be exacted of a telegraph operator within the 24-hour period, must be observed.

[4] 2. The portion of the act under which another feature is settled, as stated, is found in the first proviso to section 2:

"That no operator, * * * who by the use of the telegraph * * * reports, transmits, receives, or delivers orders pertaining to or affecting train movements shall be required or permitted to be or remain on duty for a longer period than nine hours in any twenty-four hour period in all towers, offices, places, and stations continuously operated night and day, nor for a longer period than thirteen hours in all towers, offices, places, and stations operated only during the daytime. * * *"

It appeared in the Atchison Railroad Case, supra, that the telegraph office in question was "shut from 12 to 3 by day and by night, but open the rest of the time." The government claimed, among other things, that Congress intended by the proviso to legislate in respect of all towers, offices, etc., and in the course of the opinion Mr. Justice Holmes said, at page 43 of 220 U. S., at page 363 of 31 Sup. Ct. (55 L. Ed. 361):

"We think the government is right in saying that the proviso is meant to deal with all offices. * * *"

In construing the language of the proviso, then, we may regard the law as settled that the offices now in question were embraced within the terms of the act.

[5, 6] 3. We thus come to a consideration of the question: Were the places of service at Traverse City and Pellston, during the time in issue, "night and day" offices? All telegraph offices falling within the purview of the statute are resolved into two classes—those "continuously operated night and day," and those "operated only during the daytime." Since the statute in its present form has been declared to be constitutionally valid (Baltimore & Ohio Railroad Case, supra), the validity of its scheme of classification is not, and it hardly would be, questioned here (United States v. St. Louis S. W. Ry. Co. of Texas,

[D. C.] 189 Fed. 954, 961, and citations, affirmed by the Circuit Court of Appeals, Fifth Circuit, St. Louis S. W. Ry. Co. of Texas v. United States, 199 Fed. 990, 117 C. C. A. 666). The principles underlying classification such as this do not require precise adjustment of all the rights and duties involved as respects either persons or things. Even the rule of equality admits of practical inequalities; for, after all, reasonable approximation to exactness furnishes the only standards attainable. Magoun v. Illinois Trust & Savings Bank, 170 U. S. 283, 296, 18 Sup. Ct. 594, 42 L. Ed. 1037; Billings v. Illinois, 188 U. S. 97, 102, 23 Sup. Ct. 272, 47 L. Ed. 400; Fidelity & Casualty Co. v. Freeman, 109 Fed. 847, 856, 48 C. C. A. 692, 54 L. R. A. 680 (C. C. A. 6th Cir.); Kane v. Erie R. Co., 133 Fed. 681, 685, 67 C. C. A. 653, 68 L. R. A. 788 (C. C. A. 6th Cir.). See, also, Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 78, 31 Sup. Ct. 337, 55 L. Ed. 369, Ann. Cas. 1912C, 160; Jeffrey Mfg. Co. v. Blagg, 235 U. S. 571, 576, 577, 35 Sup. Ct. 167, 59 L. Ed. ——.

The railroad seeks in two ways to escape the "night and day" class. One is by insisting that the words "continuously operated night and day" signify continuously "during every hour from midnight to midnight," and that as these offices were not so operated the defendant is not liable. The other is that the offices belong to the class which are "operated only during the daytime." It is said of the latter that the operation here, though admittedly extending into the night and also the day, is consistent with the permission to exact 13 hours of services in offices "operated only during the daytime," because in this latitude there are not that many hours of daylight each day for the greater portion of the year. The contention for the railroad thus comes to be a virtual concession that, unless the offices can rightfully be placed in the "daytime" class, the statute was violated.

The present classification was evidently made, and theoretically it must be regarded as having been made, through selection of characteristics that were common to the respective groups of objects which were intended to be erected into classes. The objects of the classification were "towers, offices, places, and stations." In considering these objects, in connection with the services therein rendered, it will at least be an aid to interpretation to observe the characteristics which were employed to describe and distinguish the two classes created— the "daytime" class and the "night and day" class. It will be found that the characteristics are not arbitrary, but that they are natural and reasonably constant. The dominant characteristic of the "daytime" class is that for a substantial portion of the year the whole service, and for the rest of the year by far the greater length of the daily service, falls within the hours of daylight; while the controlling characteristic of the "night and day" class is that the service extends into both night and day throughout the year. The fluctuations in length of service that may be rendered during the hours of daylight do not seem to us to be material, whether the one or the other of these classes be considered.

As respects the "daytime" class, the maximum service prescribed for a single operator (13 hours) cannot, it is true, be performed during the greater part of the year within the hours of daylight, yet the

parts of service which cannot be so performed correspond in time with hours of daylight for a substantial portion of the year, and so are, for all purposes of the classification, parts of the day, and not of the night; and as respects the "night and day" service, it always falls in material parts within both the night and the day. When the two classes are so considered, we do not see why confusion should arise from the use either of the word "only" in connection with the "daytime" class or the word "continuously" with the "night and day" class. The words "only" and "continuously" are to be read in connection with their respective classes, and as descriptive of conditions recurring and demanding "day" service, on the one hand, and "night and day" service, on the other. The fact that such conditions may or may not recur, and also remain throughout, each day or each night and day, cannot affect the identity of either class. Can it be doubted, for example, that offices are "continuously operated night and day," within the true intendment of the statute, wherever the same or similar and substantial lengths of service therein recur regularly every day and night for a series of successive 24-hour periods, even though the offices are not operated continuously "during every hour from midnight to midnight"? Is not the word "continuously" thus given due effect? Of course, the statute could not practically apply to any case where the office is not open more than 9 hours in any 24-hour period.

In order to exclude the offices in question from the "daytime" class, we have only to recall that, subject to negligible intermissions, the Traverse City office was operated from 4:30 a. m. to 9:30 p. m., and the Pellston office from 6:30 a. m. to 11 p. m. Another view of the situation will lead to the same result. The service rendered at Traverse City in every 24-hour period of the month in issue was 17 hours, and at Pellston 16½ hours; and thus there were 4 hours more service required at the one place, and 3½ hours more at the other, in each 24-hour period, than would have been permissible as to one telegraph operator even in a "daytime" office. It was therefore necessary to place more than one operator in each of the offices, and to require the two, who were placed in each office, to work during the same hours for a material part of each 24-hour period. As Mr. Justice Holmes said in the Atchison Railroad Case, and in part already quoted at page 43 of 220 U. S., at page 363 of 31 Sup. Ct. (55 L. Ed. 361):

"The antithesis is between places continuously operated night and day and places operated only during the daytime. We think that the government is right in saying that the proviso is meant to deal with all offices, and, if so, we should go farther than otherwise we might in holding offices not operated only during the daytime as falling under the other head."

No decision has come to our notice which sanctions a service in any office such as those here concerned for more than 9 hours in any 24-hour period. Indeed, under conference ruling No. 287 (March 16, 1908) of the Interstate Commerce Commission (Conference Rulings [Ed. April 1, 1911] p. 92), as well as by the decision in United States v. Atlantic Coast Line R. Co., 211 Fed. 897, 901, 128 C. C. A. 275 (C. C. A. 4), the present offices would be excluded from the daytime class and regarded as in the day and night class. See United States v. St. Louis & S. W. R. Co. of Texas, supra; United States v. M., K. &

T. R. R. Co. (D. C.) 208 Fed. 957, 959. In the Atlantic Coast Line Case, supra, Judge Woods, in a concurring opinion, used this language:

"There is some reason for attributing the meaning of habitually or regularly to the word continuously; but the plain construction, and that which will give the statute its full signification, is to take the whole phrase 'offices, places, and stations continuously operated night and day' to mean offices whose operation is continued from the day into the night."

It results from the views we have expressed that during the month here involved the offices in question belonged to the "night and day" class. Any other conclusion would eliminate them altogether from the operation of the statute. In view of the Atchison Railroad Case, it was not necessary that the service should be continuous; it might be intermittent. The defect, then, in defendant's plan, was that each telegraph operator was required to work more than 9 hours. The purpose of the act as defined in its title is "to promote the safety of employés and travelers upon railroads by limiting the hours of service" of the employés. The subject was peculiarly within the province of the lawmakers. Effective service and the average in hours of human endurance are vitally related. And, in the light of the ruling in the Baltimore & Ohio Railroad Case, the salutary effect of such an act cannot be frittered away through any opposed theory of the carrier, as here, touching the proper duration of time for work and for recuperation.

[7] Although the act is to be enforced through the imposition of penalties, it is "not to be construed so strictly as to defeat the obvious intention of the Legislature." United States v. Wiltberger, 5 Wheat. 76, 93, 5 L. Ed. 37; Johnson v. Southern Pacific Co., 196 U. S. 1, 17, 25 Sup. Ct. 158, 49 L. Ed. 363; Frank Unnewehr v. Standard Life & A. Ins. Co., 176 Fed. 16, 25, 99 C. C. A. 490 (C. C. A. 6th Cir.).

The judgment must be reversed, and the case remanded for further proceedings not inconsistent with this opinion.