UNITED STATES v. ILLINOIS CENT. R. CO.

(District Court, N. D. Iowa, C. D. November 12, 1915.)

No. 50.

1. STATUTES ☞219—CONSTRUCTION—HOURS OF SERVICE ACT—EFFECT OF INTERPRETATION BY INTERSTATE COMMERCE COMMISSION.

The interpretation of Hours of Service Act March 4, 1907, c. 2939, 34 Stat. 1415 (Comp. St. 1913, §§ 8677–8680), by the Interstate Commerce Commission, as to the meaning of the words "towers, offices, places and stations" and the phrase "continuously operated night and day," though not controlling, is quite persuasive, entitled to weight, and may well be followed, unless it clearly appears from the plain language of the enactment to be erroneous.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 296, 297; Dec. Dig. ☞219.]

2. MASTER AND SERVANT ☞13—HOURS OF SERVICE FOR EMPLOYÉS—HOURS OF SERVICE ACT.

The test for the period that railroad employés handling train orders may be kept on duty during a 24-hour period without violating the Hours

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of Service Act is the time during which the office, station, or place where the employé works is kept open for the performance of such duties during the 24-hour period, and is not the number or frequency of train orders that may be handled during a given period.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ⊕⊶13.]

3. MASTER AND SERVANT ⊕⊶13—HOURS OF SERVICE FOR EMPLOYÉS—HOURS OF SERVICE ACT.

Where the traffic of a carrier is such that it deems it necessary that train orders be transmitted or received by the use of the telegraph or telephone at certain stations during both the day and night, it must limit the hours of service of its employés who are to perform this service in interstate traffic at such stations to not exceed 9 hours in the aggregate in any 24-hour period.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ⊕⊶13.]

4. MASTER AND SERVANT ⊕⊶13—HOURS OF SERVICE FOR EMPLOYÉS—HOURS OF SERVICE ACT.

An employé of a railroad company, handling train orders in interstate traffic at a station operated both day and night, can be kept at work not more than 9 hours in the aggregate in any 24-hour period under Hours of Service Act, and the fact that the place where the employé is to perform this duty is in a station building, or above it, or a short distance from it, or in all of them at different times during the same period of service, is immaterial.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ⊕⊶13.]

5. MASTER AND SERVANT ⊕⊶13—HOURS OF SERVICE ACT—PENALTIES FOR REQUIRING EMPLOYÉS TO WORK MORE THAN NINE HOURS.

Where defendant required employés handling train orders in interstate traffic to remain on duty in excess of 9 hours in each 24-hour period at a station where the train orders in the daytime were handled in the depot, and during the nighttime at the tower a short distance from the depot, held, defendant was liable for the penalties prescribed by the Hours of Service Act.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ⊕⊶13.]

6. MASTER AND SERVANT ⊕⊶13—HOURS OF SERVICE—PENALTIES FOR VIOLATION OF HOURS OF SERVICE ACT—APPROVAL OF INTERSTATE COMMERCE COMMISSION.

The fact that the Interstate Commerce Commission approved defendant's operation of its railroad in requiring employés handling train orders to work more than 9 hours a day does not estop or preclude the government from recovering the penalties incurred by a violation of the Hours of Service Act, but may be considered in mitigation of such penalties.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ⊕⊶13.]

At Law.   Action by the United States against the Illinois Central Railroad Company to recover penalties for violations of the Hours of Service Act.   Judgment for plaintiff.

F. A. O'Connor, U. S. Atty., of New Hampton, Iowa, and Monroe C. List, Sp. Asst. U. S. Atty., of Washington, D. C.
Helsell & Helsell, of Ft. Dodge, Iowa, for defendant.

⊕⊶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

REED, District Judge. This suit is to recover from the defendant railroad company, a common carrier in interstate commerce, $7,500 for 15 alleged violations of the Hours of Service Act. The defendant denies any violation of the act. The cause is submitted upon the pleadings and an agreed statement of facts, which statement is on file with the clerk and is referred to as part hereof, and contained in a note attached hereto.[1]

The road of the defendant company in Iowa is crossed at Manson, Fonda, and Rockwell City by other railroads, and at each of these places an interlocking switch has been installed, which is operated by its employés from towers erected at short distances from the station or depot building at each place, which are necessary to the safe operation of its road at such stations and were not erected and are not used to evade the provisions of the Hours of Service Act. The applicable provisions of the Act of Congress approved March 4, 1907, effective one year thereafter (34 Stat. 1415), commonly called the Hours of Service Act, are as follows:

"Sec. 2. That it shall be unlawful for any common carrier, its officers or agents, subject to this act to require or permit any employé subject to this act to be or remain on duty for a longer period than sixteen consecutive hours: * * * Provided, that no operator, train dispatcher, or other employé who by the use of the telegraph or telephone dispatches, reports, transmits, receives, or delivers orders pertaining to or affecting train movements shall be required or permitted to be or remain on duty for a longer period than nine hours in any twenty-four hour period in all towers, offices, places and stations continuously operated night and day, nor for a longer period than thirteen hours in all towers, offices, places, and stations operated only during the daytime. * * *" Comp. St. 1913, § 8678.

For a violation of the foregoing provisions the carrier, or any officer or agent who requires or permits such violation, is liable to a penalty not exceeding $500 for each and every such violation.

[1] The language of the proviso fixing the time and place when the employés therein named may be kept on duty is not entirely clear, and the phrases "towers, offices, places and stations," and "continuously operated night and day" may admit of different interpretations; but the Interstate Commerce Commission, in its conference or administrative ruling No. 287 of March 16, 1908, said:

"(f) The phrase 'towers, offices, places and stations' is interpreted to mean particular and definite locations. The purpose of the law and of the proviso for 9 hours of service may not be avoided by erecting offices, stations, depots, or buildings in close proximity to each other and operating from one a part of the day while the other is closed, and vice versa.

"(g) The phrase 'continuously operated night and day' is interpreted as applying to all offices, places, and stations operated during a portion of the day and a portion of the night a total of more than 13 hours; and the phrase 'operated only during the daytime' refers to stations which are operated not to exceed 13 hours in a 24-hour period, and is not considered as meaning that the operator thereat may be employed only during the daytime."

This interpretation of the proviso, though not controlling, is quite persuasive, is entitled to much weight, and may well be followed, unless it clearly appears from the plain language of the enactment to

[1] See note at end of case.

be erroneous. See United States v. Grand Rapids & Indiana Ry. Co., 224 Fed. 667, 140 C. C. A. 177, and cases there cited; also Chicago, Rock Island & Pacific R. R. Co. v. United States, 226 Fed. 27, 141 C. C. A. 135 and cases cited (C. C. A. 7th Circuit).

The purpose of the act, as indicated by its title, is "to promote the safety of employés and travelers upon railroads by limiting the hours of service of employés thereon," and in Baltimore & Ohio R. R. v. Interstate Commerce Commission, 221 U. S. 612, at page 619, 31 Sup. Ct. 621, at page 625, 55 L. Ed. 878, it is said:

"The length of hours of service has direct relation to the efficiency of the human agencies upon which protection to life and property necessarily depends. This has been repeatedly emphasized in official reports of the Interstate Commerce Commission, and is a matter so plain as to require no elaboration. * * *"

To accomplish this:

"It was also competent to consider, and to endeavor to reduce, the dangers incident to the strain of excessive hours of duty on the part of engineers, conductors, train dispatchers, telegraphers, and other persons embraced within the class defined by the act."

[2, 3] The test, therefore, for the period that employés of the class named in the proviso may be kept on duty during a 24-hour period without violating this statute, is the time during which the office, station, or place where the employé is to perform such duties is kept open for the performance thereof during a 24-hour period. It is not the number or frequency of such train orders that may be transmitted or received during a given period that determines the time the employé may be kept on duty during the 24 hours; but it is the necessity of the transmission or receipt of such orders at specified stations where employés of this class may be on duty to properly perform this service during the day and night, and that is determined by the fact that the carrier requires that such orders be transmitted and received at such stations. If the traffic of the carrier is such that it deems it necessary that train orders be transmitted or received by the use of the telegraph or telephone at certain stations during the day and night, it must limit the hours of service of its employés who are to perform this service in interstate traffic at such stations to not exceed 9 hours in the aggregate in any 24-hour period. This is the plain reading of the enactment, and is the interpretation thereof by the Interstate Commerce Commission.

[4] Whether the place where the employé is to perform this duty is in a station building, or above it, or a short distance from it, or in all of them at different times during the same period of service, is quite immaterial. That may be arranged to suit the convenience of the carrier, without making two separate and distinct places for the transmission and receipt of such orders; and, whatever the arrangement may be in this respect, the carrier who adopts this method of transmitting and receiving train orders for trains passing such a station may not lawfully permit or require the employé to be or remain on duty for a longer period than 9 hours in the aggregate during a 24-hour period, if the station is one continuously operated night and

day for the transmission and receipt of such orders, or 13 hours at all such places operated only during the day. It may be that in certain seasons of the year and in certain localities the place cannot be operated for 13 hours by the light of day only, nor 9 hours in what is commonly called the nighttime; but, dividing the day of 24 hours into periods of 12 hours each, from 6 a. m. to 6 p. m., and from 6 p. m. to 6 a. m. as is commonly done, there need be no difficulty in determining the daytime from the night within the contemplation of this enactment.

[5] It clearly appears from the agreed statement of facts that each of the stations where it is alleged in the several counts of the petition that the employés of the defendant were required to be and remain on duty in excess of 9 hours in a 24-hour period was a station and place continuously operated night and day for the transmission and receipt by telegraph or telephone of train orders affecting the movement of trains passing each of said stations, and that each of said employés was regularly engaged in that service at the station where he was so employed, and remained on duty in excess of 9 hours in each 24-hour period that he was on duty. It follows, therefore, that the defendant has incurred the penalty prescribed by the act upon each count of the petition.

It appears from the correspondence between the officials of the defendant company and the Interstate Commerce Commission in 1908, in regard to the defendant's telegraph service at Matteson, Ill. (made a part of the agreed statement of facts), that the Commission approved defendant's telegraph system at Matteson, which is similar to the systems of the defendant at Manson, Fonda, and Rockwell City, and in its closing letter in reference to the Matteson system the Commission said:

"The Commission approves the spirit in which your letter is written, and no further action will be taken in this case for the present, at least on our own motion. [Signed by the secretary of the Commission.]"

[6] Whatever the purpose of introducing this correspondence in this case, the defendant cannot successfully claim therefrom that the government is estopped or precluded from recovering the penalties incurred by it for a violation of the act at its stations in question in this proceeding. It may be that the approval by the Commission of defendant's system at Matteson led it to believe that it might lawfully continue the use of its telegraph systems at Manson, Fonda, and Rockwell City. It may therefore be considered in mitigation.

The judgment, therefore, is that the plaintiff recover $50 on each of the 15 counts of the petition, or $750 in all, with costs. It is accordingly so ordered. Defendant excepts.

### NOTE.

#### Agreed Statement of Facts.

Paragraph 1. It is hereby stipulated and agreed by and between the parties to the above-entitled action that a jury is waived, and the cause shall be tried to the court upon the following statement of facts; each party reserving the right to object to any fact on the ground of its incompetency, irrelevancy,

or immateriality, and to introduce further evidence by testimony of witnesses, and each party also reserving the right to except to the judgment of the court and prosecute writ of error:

Par. 2. It is stipulated and agreed that the defendant is, and was at all times, as alleged in plaintiff's petition, a corporation organized and doing business under the laws of the State of Illinois, and that its railroad extended through the cities of Manson, Fonda, and Rockwell City, in the state of Iowa; that it is a common carrier, and was at all times mentioned in plaintiff's petition engaged in interstate commerce by railroad in that state.

Par. 3. It is further agreed that in the said city of Rockwell City the defendant has, since the construction of its road, maintained a depot building, in which the business usually carried on in such a building is conducted; that said depot was built in 1905, and is equipped with a telegraph instrument, an Illinois Central dispatcher's telephone, and a city telephone; that the interlocking tower at Rockwell City was built in 1900.

Par. 4. That the employés named in each of the 15 counts of the plaintiff's petition were, at the times alleged, employés of the defendant, and worked during the hours alleged in said petition, to wit: Counts 1, 2, and 3—Enoch G. Voss at Rockwell City, from the hour of 7 a. m. to the hour of 7 p. m. on each of the three days, May 1, 2, and 4, 1914, with one hour off at noon for dinner. Counts 4 and 5—G. B. Litchkey at Rockwell City, Iowa, from the hour of 7 p. m. to the hour of 7 a. m. the succeeding day on each of the two days, May 1, and 2, 1914, with one hour off at midnight for lunch. Counts 6 to 8—Oxel E. Johnson at Manson, Iowa, from the hour of 7 a. m. to the hour of 7 p. m. on each of the three days, May 1, 2, and 4, 1914, with one hour off at noon for dinner. Counts 9 and 10—O. F. Spangler at Manson, Iowa, from the hour of 7 p. m. to the hour of 7 a. m. the succeeding day on each of the two days, May 1 and 2, 1914, with one hour off at midnight for lunch. Counts 11 to 13—E. Recknagel at Fonda, Iowa, from the hour of 7:10 a. m. to the hour of 8:20 p. m. on each of the three days, May 1, 2, and 4, 1914, with one hour off at noon for dinner. Counts 14 and 15—F. D. Mangold at Fonda, Iowa, from the hour of 7 p. m. to the hour of 7 a. m. the succeeding day on each of the two days, May 1 and 2, 1914, with one hour off at midnight for lunch.

Par. 5. That said employés, while on duty during said hours, by the use of the telegraph and telephone, reported, transmitted, received, and delivered orders pertaining to and affecting the movements of trains engaged in interstate commerce.

Par. 6. That said employés at Rockwell City worked as follows: Voss was what is termed an agent and operator, and worked at defendant's depot at Rockwell City from 7 a. m. to 7 p. m. At 7 p. m. Operator Litchkey reported for duty, taking charge of the train register and train order book at the depot, carrying the same to defendant's tower 750 feet east from said depot. That at 7 a. m. he returned to the depot with the train register and order book, turning them over to the operator for the defendant at such depot. That all orders and messages, received or sent by the use of the ordinary telegraph instrument or telephone, pertaining to train movements, received and delivered at Rockwell City between the hours of 7 a. m. and 7 p. m., were received and delivered at said depot. That all orders pertaining to the Illinois Central trains, received and delivered at Rockwell City between the hours of 7 p. m. and 7 a. m. the succeeding day, were received and delivered at said tower, the night tower man performing no work whatever at the depot, and the day operator performing no work whatever at the tower. .

Par. 7. That said employés at Manson, Iowa, worked as follows: Johnson worked as agent and operator in defendant's depot at Manson from 7 a. m. to 7 p. m. That the operator leverman Spangler went on duty at 7 p. m., first getting mail at the post office and taking it to the depot. He then proceeded to defendant's telegraph office at the interlocking tower 900 feet west of the depot, arriving at 7:15 p. m. He remained at the tower until about 8:45 or 9 p. m., at which time he returned to the depot, taking charge of the cash on hand and clerical work connected with the station, about 15 minutes later again returning to the tower, and remaining until about 3:45 a. m. in the capacity of telegraph operator and leverman. At about 3:45 a. m. he again returned to the depot, meeting defendant's train 611, there selling tickets and checking baggage for a period of about 30 minutes. He by telegraph or tele-

phone also reported the leaving of this train from the depot to the dispatcher at Cherokee, after which he took the mail to the post office, returning to the tower, then going to the depot at about 6:35 a. m. to sell tickets and check baggage for defendant's train 631, due at 7:05 a. m., selling tickets, checking baggage, etc., for about 25 minutes, being relieved by Johnson at 7 a. m.

Par. 8. That such employés worked at Fonda, Iowa, as follows: Recknagel worked as agent and operator in defendant's depot from 7:20 a. m. to 8:20 p. m. Operator F. D. Mangold began duty at defendant's telegraph tower 305 feet west of the depot at 7 p. m., remaining there until 8:20 p. m., at which hour, having notified the dispatcher, he went to the depot to get the cash and clerical work, returning about 15 minutes later to the tower, and there resuming the duties of operator, and remained at the tower until about 4:20 a. m., when he went to the depot to meet the defendant's train 611, due at Fonda at 4:50 a. m., selling tickets and checking baggage for said train 611, taking about 30 minutes for this work.

Par. 9. That said towers at Manson and Fonda were erected in the years 1901 and 1900, respectively, and the depots in the years 1893 and 1870, respectively. That the method of the performance of said work, as above described, was instituted prior to March 4, 1908, and subsequent to March 4, 1907.

Par. 10. That such operating towers are necessary to the proper operation of defendant's railroad, and were not erected for the purpose of evading the federal act under which this suit is brought.

Par. 11. It is further stipulated and agreed that the operator, train dispatcher, or other employé performing the work in the depot building at Rockwell City in each 24-hour period between the hours of 7 a. m. and 7 p. m. does not perform any duties whatsoever at said tower; and it is further stipulated that the operator, train dispatcher, or other employé at Rockwell City employed between the hours of 7 p. m. and 7 a. m. in the said tower does not work at said depot building during said period of employment, or at any other time.

Par. 12. It is further agreed that none of said employés was on duty performing work of any character whatsoever for a longer period than 13 hours on any of said days.

Par. 13. It is further stipulated and agreed that the interlocking towers at Rockwell City, Fonda, and Manson were used by the tower levermen in the operation of the levers during the daytime, and by other employés not named herein.

Par. 14. It is further agreed that the attached correspondence is an exact copy of the original, and is made a part of this stipulation.

F. A. O'Connor, United States Attorney.
Monroe C. List, Sp. Asst. U. S. Atty.
Helsell & Helsell, Attorneys for Defendant.

It is further agreed that the attached correspondence is an exact copy of the original and is hereby made a part of this stipulation.

"Interstate Commerce Commission.

"May 20, 1908.

"Mr. G. H. Groce, Supt. of Telegraph & Signals, Illinois Central Railroad Company, Chicago, Ills.—Dear Sir: The Commission is in receipt of information that at Matteson, Illinois, where you have a tower at the crossing of the Michigan Central Railroad, you are operating the station with two telegraphers, who work twelve hours each out of a period of twenty-four hours, and that these two offices are in very close proximity. It would appear that this arrangement is not in conformity with the so-called Hours of Service Law, nor with the Commission's administrative ruling and opinion thereon, copies of which are inclosed herewith. We trust that you will give this matter careful investigation, and, if the facts are as stated, rearrange the service.

"Very respectfully,          [Signed]  E. A. Moseley, Secretary."

"June 2, 1908.

"Mr. E. A. Moseley, Sec'y Interstate Commerce Commission, Washington, D. C.—Dear Sir: I have your letter of May 20th giving notice that the Com-

mission has information to the effect that the telegraph operators employed by the Illinois Central Railroad Company at Matteson, Illinois, are being required to work in a manner not in conformity with the so-called 'Hours of Service Law' and the Commission's administrative ruling and opinion thereon.

"In order to set forth the situation at Matteson as clearly as possible you will find enclosed with this letter two blueprints marked respectively 'D' and 'E,' to which prints reference will be made in this letter.

"In the year 1889 there existed at Matteson, Ill., a depot building located in the southeast angle caused by the railroad crossing, and a telegraph office was operated in the depot building. In that year an interlocking plant was installed for the protection of the crossing of the Michigan Central and Illinois Central tracks, and the interlocking tower building was located in the northwest angle made by the crossing tracks. Telegraph operators were used as towermen, and telegraph service relating to the railroad company's business, including train order business, was handled in the tower. The tower was of course, a continuously operated office. The telegraph office in the depot building, located 40 feet from the tower building, was a day-only office. This condition of affairs existed on March 4, 1908, at which time the Hours of Service Law took effect. At that time the telegraph office in the tower was discontinued as a day train order office, and it has not been since used for the handling of train orders between the hours of 7 a. m. and 7 p. m. All train order work necessary at Matteson, Illinois, between the hours of 7 a. m. and 7 p. m., is handled in the telegraph office located in the depot building. The Illinois Central Railroad Company therefore considers that neither of these telegraph offices are continuously operated night and day for the purpose of dispatching, reporting, transmitting, receiving, or delivering orders by telegraph or telephone pertaining to or affecting train movements.

"Prior to March 4, 1908, the work of rebuilding complete the interlocking plant, which has been in service at Matteson, Ill., since 1889, was commenced, and this work was completed in April, 1908. In the reconstruction of the plant the tower was, for convenience in operation and construction, located in the northeast angle made by the crossing tracks, instead of the northwest angle. Beyond this there has been no change whatever made in the character of the work performed by the men located in the tower, and the office in the depot building, 35 feet from the tower building, has been maintained as a day office in precisely the same manner as the operation had been conducted previously.

"The legal department of our system was consulted by the transportation department when these problems came up just prior to the effectiveness of the Hours of Service Law, and it was the advice of that department that our arrangement to discontinue the tower as a day train order office would make it entirely within the terms of the law for the men employed in the tower to work 13 hours per day, if necessary. As a matter of fact, they are working 12 hours per day.

"This matter has been further referred to in our legal department upon receipt of your letter of May 20th. It is the opinion given by our legal department that this does not constitute a violation of the fifth paragraph of section 2 of the administrative ruling and opinion of the Interstate Commerce Commission on the Hours of Service Act. There was in this case no building erected for the purpose of changing in any manner the arrangement of the two offices at Matteson from the manner in which they had been worked for 19 years previously.

"Yours truly,                            Supt. Telegraph & Signals."

"Interstate Commerce Commission.

"June 10, 1908.

"Mr. G. H. Groce, Supt. Telegraph & Signals, Illinois Central Railroad Company, Chicago, Ills.—Dear Sir: We are in receipt of your communication of the 2d instant, in regard to the station at Matteson, Ill., in which you state that the telegraph office in the depot building, located 40 feet from the tower building, was a day office only, which condition of affairs existed on March 4, 1908, at which time the Hours of Service Law took effect. At that time the telegraph office in the tower was discontinued as a day train order office, and.

it has not been since used for the handling of train orders between the hours of 7 a. m. and 7 p. m. All train order work necessary at Matteson between the hours of 7 a. m. and 7 p. m. is handled in the telegraph office located in the depot building. You further state that the legal department of your system was consulted by the transportation department when these problems came up just prior to the effectiveness of the Hours of Service Law, and their advice was that it would not be a violation of the law to arrange the service in the manner as stated by you.

"Literally it may be true that this is not a continuously operated office. However, it would appear that at the time you made the change and sought the advice of the legal department you must have been somewhat in doubt, and it may be urged that it is an evasion of the law. The Commission, therefore, would be very much pleased if this service could be rearranged.

"Yours respectfully,        [Signed]    E. A. Moseley, Sec'y I. C. C."

"July 7, 1908.

"In re Putting a Third Man in the Interlocking Tower at Matteson.

"Mr. I. G. Rawn, Vice President—Dear Sir: I have yours of July 6, 1908, in the above matter, with inclosures which I herewith return. I have already given an opinion to the effect that there is nothing unlawful in the condition there. My opinion is unchanged. If I am correct as to the law, I see no reason why we should incur an additional expense simply to gratify the secretary of the Interstate Commerce Commission. That, however, is a matter for you to determine. Of course, it may turn out that I am mistaken, but I have given the matter careful consideration and have stated my opinion as to the law.

"By section 3 of the act it is provided that any such common carrier, or any officer or agent thereof, requiring or permitting any employé to go, be, or remain on duty in violation of the second section thereof, shall be liable to a penalty of not to exceed five hundred dollars for each and every violation, to be recovered in a suit or suits to be brought by the United States district attorney in the District Court of the United States having jurisdiction in the locality where such violation shall have been committed. It does not say whether each day would be a recurrent offense; but, construing section 3 in connection with section 2, I am inclined to the opinion that such would be the case.

"Yours truly,                    J. M. D., General Counsel."

"Chicago, July 27, 1908.

"Hon. J. M. Dickinson, General Counsel—Dear Sir: I hand you herewith some correspondence relative to putting on a third man in the interlocking tower at Matteson. You are more or less familiar with this subject, inasmuch as it has previously been referred to you by the superintendent of telegraph and signals.

"Briefly, the conditions are in the year of 1889 there existed at Matteson a depot building located in the southeast angle of the railroad crossing and a telegraph office was operated in the depot building. In that year an interlocking tower was installed for the protection of the crossing of the Michigan Central and this company, and the interlocking tower building located in the northwest angle made by the crossing of the tracks. Telegraphers were installed in the tower, and telegraph service relating to the railroad company's business, including the handling of train orders, was handled in the tower; this service in the tower constituting what is known as a continuous office. The telegraph office in the depot, located 40 feet from the tower building, was a day office only. This condition existed on March 4, 1908, at which time the Hours of Service Law took effect. At the time the Hours of Service Law took effect, the telegraph office in the tower was discontinued as a day train order office, and has not since been used for the handling of train orders between the hours of 7 a. m. and 7 p. m. All train order work necessary between these hours is handled in the telegraph office located in the depot building. We have, therefore, considered that neither the telegraph office in the interlocking tower nor the depot proper are continuously operated night and day for the purpose of dispatching, recording, transmitting, receiving, or delivering orders by telegraph or telephone, pertaining to or affecting the movement of the trains.

"Prior to March 4th last we had contemplated rebuilding complete the interlocking plant, this work being completed in April, 1908. In the reconstruction of the plant, for convenience in operation and construction, the tower was located in the northeast angle, instead of the old location in the northwest angle. Beyond this there has been no change in the character of the work performed by the man located in the tower or in the office of the depot building.

"Kindly now note that the secretary of the Interstate Commerce Commission, in his letter of June 10th addressed to Mr. Groce, states, literally speaking, it may be true this is not a continuously operated office; that, however, it would appear at the time the change was made—i. e., discontinuing the day office in the interlocking tower—some doubt must have existed, and it may be urged that it is an evasion of the law. The Commission, therefore, suggested that the service be rearranged.

"Shall be very pleased to have your opinion whether we should comply with this suggestion.

"Yours truly,                    [Signed]    I. G. Rawn, Vice President."

"August 5, 1908.

"Mr. E. A. Moseley, Secy. Interstate Commerce Commission, Washington, D. C.—Dear Sir: Referring to the correspondence which has passed between yourself and our Mr. Groce, Superintendent of Telegraph & Signals, in relation to the telegraph service at Matteson, Ill., the situation at that point being referred to in letter from you under date of May 20th and Mr. Groce's reply of June 2, 1908.

"The matter having been referred to me by Mr. Groce, beg to advise the railroad company is still unable to understand wherein the present arrangement at Matteson, as outlined to you by Mr. Groce in his letter of June 2d, is in any way a violation of the so-called Hours of Service Law, or of the administrative ruling and opinion issued by order of the Commission March 16, 1908.

"The attention that was given this matter by our law department as stated in the last paragraph of your letter, was not given on this specific point. The Illinois Central Railroad, in common with other companies, arranged for a meeting of their transportation and law departments just prior to the effectiveness of the Hours of Service Law, and all questions in general were discussed for the purpose of enlightening the men whose duties required them to see that the provisions of the law were obeyed.

"The managing officials of the Illinois Central Railroad have been careful to have it understood that there should be no attempt to install practices that might be termed evasions of the law. On the other hand, the interpretation of such points as might be considered not altogether clear has always been toward a liberal view. With this course in mind, we still do not feel that the present practices at Matteson, are in any way a violation of the law, or an evasion. You understand, of course, that the tower house was not erected to evade the law, but had been in use as a telegraph office a long time prior to the passage of the Hours of Service Law.

"Yours truly,                    General Manager."

"Interstate Commerce Commission.

"August 12, 1908.

"Mr. F. B. Harriman, General Manager, Illinois Central Railroad Company, Chicago, Illinois—Dear Sir: Receipt is acknowledged of your communication of the 5th instant, and we note your explanation of the arrangement of the service on your road at Matteson, Ills., and your statement that the tower house was not erected to evade the law, but had been in use for a long time prior to the passage of the Hours of Service Act, and that the managing officials of the Illinois Central have been careful to have it understood that there must be no attempt to install practices that might be termed evasions of the law. The Commission appreciates the spirit in which your letter is written, and no further action will be taken in this case for the present, at least not for our own motion.

"Yours truly,                    E. A. Moseley, Sec'y."