PENNSYLVANIA R. CO. v. UNITED STATES. (No. 43.)

(Circuit Court of Appeals, Third Circuit. December 19, 1917.)

1. MASTER AND SERVANT ⬤⟿13—OPERATION—HOURS OF SERVICE ACT—CON-
STRUCTION.

Hours of Service Act March 4, 1907, c. 2939, § 2, 34 Stat. 1416 (Comp.
St. 1916, § 8678), declares that it shall be unlawful for any common carrier
to require or permit any employé to remain on duty for a longer period
than 16 consecutive hours, and whenever such employé shall have been
continuously on duty for 16 hours he shall be relieved, and not required
or permitted again to go on duty until he has had at least 10 consecutive
hours off duty, and no such employé, who has been on duty 16 hours in
the aggregate in any 24-hour period, shall be required or permitted to
again go on duty without having at least 8 consecutive hours off duty.
Engineers and firemen employed on extra engines, whose duty it was to
assist freight trains in going up mountain grades of defendant's line,
after assisting a freight train over the grades from one point to another,
there waited until another freight train should come from the opposite
direction, when the same engine assisted such train over the grade to
the pusher's starting point, and here the engine waited until the arrival
of another freight train, when the process was repeated. The crews of
the extra engines had. much unoccupied time, and the plan was adopted of
relieving them entirely during the interim from all work or care of their
engines, and the crews, though subject to call, were given opportunity to
recuperate in rest houses furnished by defendant, and in some places
they were allowed, though subject to call, to go to lodgings and elsewhere
at the points where their service ended. *Held* that, though the Hours of
Service Act is remedial and for the benefit of travelers, yet, in view of
the adoption of the plan while the United States was engaged in the
prosecution of a war making great demands upon its transportation
systems, and of the fact that the crews of the pushing engines were re-
lieved of all duties while awaiting other trains, it cannot as a matter of
law be declared that defendant violated the Hours of Service Act, al-
though such employés, if the rest periods, during which they received pay
and were subject to call, be counted, worked more than 16 consecutive
hours a day, but that question can only be determined by consideration
whether the periods off were restful.

2. MASTER AND SERVANT ⬤⟿13—OPERATION—HOURS OF SERVICE ACT.

As the Hours of Service Act declares that it shall be the duty of the
Interstate Commerce Commission to enforce the provisions of the stat-
ute, and all powers granted to the Commission are extended to it in the
execution of such act, the Commission should promulgate a practical
working scheme for compliance with the act, instead of leaving railroad
companies to determine at their peril whether their plan violates the act,
and such procedure should be followed in preference to prosecutions
under the act; this being particularly true where, as a war measure, a
railroad company is attempting to operate its system at maximum ca-
pacity.

In Error to the District Court of the United States for the Western
District of Pennsylvania; Charles P. Orr, Judge.

Action by the United States against the Pennsylvania Railroad Com-
pany. There was a judgment for plaintiff, and defendant brings error.
Reversed and remanded.

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
246 F.—56

Patterson, Crawford & Miller, of Pittsburgh, Pa., for plaintiff in error.

E. Lowry Humes, U. S. Atty., of Pittsburgh, Pa.

Before BUFFINGTON and WOOLLEY, Circuit Judges.

BUFFINGTON, Circuit Judge. In the court below the United States brought suit against the Pennsylvania Railroad Company, to recover penalties for alleged violation of Act March 4, 1907, 34 Statutes at Large, p. 1415, entitled "An act to promote the safety of employés and travelers upon railroads, by limiting the hours of service of employés thereon." The facts were agreed upon by stipulation, and the court below entered a judgment for the plaintiff for the penalties in question. Thereupon the railroad sued out this writ of error.

The case turns on the construction of the section of said act quoted in the margin.[1] The object of said act, as stated in its title, is "to promote the safety of employés and travelers upon railroads," and the enacted means for promoting their safety are, as stated in the title, "by limiting the hours of service of employés thereon."

[1] Turning to the act as a whole, we find the hours of service of employés are of two kinds: First, those who, 'as recited in the above-quoted section, "have been *continuously* on duty for sixteen hours," as to whom the act provides they "shall be relieved and not required or permitted again to go on duty until he has been at least ten consecutive hours off duty." The other employés and their hours of service are where the employé "has been on duty sixteen hours in the *aggregate* in any twenty-four hour period," and as to them, they shall not be "required or permitted * * * again to go on duty without having had at least eight consecutive hours off duty."

The manifest purpose of the act is to afford adequate periods of absolute rest to the employés, at the end of certain hours of employment. That the employment is of different kinds is recognized by the fact that in one sort of work ten hours must elapse before the employé could work again; in the other class of work, eight hours only must elapse. Manifestly, it was thought the two kinds of work, viz. "continuous" and "in the aggregate" were of such difference in character that two hours more of an interim were required where consecutive hours' work had been done than where aggregate hours was the case.

This statute manifestly does not concern any questions of wages or other relation between the railroad and its employés. Its whole concern is the safety of passengers and of train employés generally, and

[1] "Sec. 2. That it shall be unlawful for any common carrier, its officers or agents, subject to this act to require or permit any employé subject to this act to be or remain on duty for a longer period than sixteen consecutive hours, and whenever any such employé of such common carrier shall have been continuously on duty for sixteen hours he shall be relieved and not required or permitted again to go on duty until he has had at least ten consecutive hours off duty; and no such employé who has been on duty sixteen hours in the aggregate in any twenty-four hour period shall be required or permitted to continue or again go on duty without having had at least eight consecutive hours off duty."

that the safety of such passengers and of such employés shall not be jeopardized by the undue length of service of the latter. The statute should be so construed as to further these ends in letter and spirit.

Turning, then, to the facts of this case, we find they concern the working hours of engineers and firemen employed on certain extra freight engines called "pushers," whose duty it was to push or assist freight trains in going up the mountain grades on the defendant's Philadelphia & Erie Line, a work which, of course, had a direct bearing on the safety of passengers and employés on passing trains. In performing such service, the pusher's crew would help over the mountain grades a freight train from one point to a certain other point, and there wait until another freight train came in the opposite direction, when it would assist such train over the grade to the pusher's initial starting point. Here it would wait until another freight train came along, when the process was repeated. In such work the crew had necessarily much unoccupied time, and the plan was adopted of relieving them entirely during such interim from all work or care of their engines; that work being done by the hostlers. But in this interim the men were, of course, subject to be called as soon as another freight came along. To that end they were required to specify some place where they could be reached by the hostler, and for such interim they were paid at the same rates as though they had been at work. At some places the railroad provided rest houses, where the men were required to stay, and could retire if they so desired. At other places there were rooming houses, where the men could get lodging if they desired, and be called there. At another place, on the outskirts of the city of Warren, they were free to go into the city and spend their time as they saw fit, but they had to keep in touch with certain places, to which calls for them could be sent.

As illustrative of the practical working of this system, we cite typical instances at each point. For example: The pusher reached St. Mary's at 6:20 a. m. Thereupon the trainmen went to the rest house, where they stayed until 7:15 a. m., when they were recalled for duty. They again rested at St. Mary's in the same way from 1:35 p. m. to 2:30 p. m. If during these two periods at the rest house, aggregating one hour and fifty minutes, these men are to be regarded as continuously on duty, then the railroad violated the statute. On the other hand, if this interim time is not so regarded, then these men have only been on duty in the aggregate fifteen hours and ten minutes.

Substantially similar circumstances and times were involved in four other cases at the rest house at Kane, another point on the road. Other cases were at Emporium and Warren, where there was no rest house furnished by the railroad, but the employés went to lodgings near the railroad and were off duty for two hours. In all of these cases, during the times they were off duty, they were subject to call, and of course had to remain within call; but they were relieved from care of their engines and were paid for such time at the regular rates.

In disposing of the case, the court below regarded as decisive the fact that during the rest period the employé "was not free to go where he pleased or do what he pleased." But this, as it seems to us, overlooks the spirit and purpose of this act. Its object is to have the train

service done by men who are not overstrained and overworked, and in applying the act and fulfilling its purpose the question of fact necessarily arises whether, when the trainman was relieved from duty and time was given him to rest, was this rest of a substantial character; did it tend to fit him for the safety of the service, or did it tend to further unfit him for service? If the time was of such short duration as not to tend to really resting and recuperating the physical and mental faculties of the men, then it might well be regarded as a negligible quantity, and as part of the continuous service. But where it was of such a substantial period that it would rest and would recuperate, and would relieve from strain, then the service, instead of being a continuous one, was a broken one, made up of an aggregate of the work periods before and after the substantial real rest period.

We find nothing in the cases cited to us at real variance with this view. In United States v. Grand Rapids, etc., 224 Fed. 668, 140 C. C. A. 177, section 3 of the act relating to railroad telegraphers was involved. By that section in day and night offices there was a nine-hour limitation which was exceeded. In United States v. Denver, etc. (D. C.) 197 Fed. 629, the train was simply side-tracked to await the passage of another train. Manifestly there was no break in the continuity of the trainmen's service; they continued in charge of their own train and were obliged to watch for the expected train. In United States v. Chicago, etc. (D. C.) 197 Fed. 626, a work train was stopped for meals, and this was held not to break the continuity of the service; the court saying:

"If a railroad may relieve its employés from service during meal hours, it may also relieve them from service every time a freight train is tied up on a side track waiting for another train, and thus defeat the very object the Legislature had in view. The brief interruptions for meals were 'trifling interruptions,' in the language of the court in the Atchison Case, 220 U. S. 37 [31 Sup. Ct. 362, 55 L. Ed. 361]."

Without discussing in detail the many other cases cited, each of which depends on the particular circumstances thereof, it suffices to say that in our judgment the whole subject is very well summarized in United States v. Northern Pacific (D. C.) 213 Fed. 539, where the court said:

"The purpose of the statute is plain, and it must be so construed as to promote its policy. The hours of service of railway trainmen are long at best, leaving only eight hours for rest and recreation, and if this brief period can be broken into fragments the purpose and policy of the law will be entirely frustrated. If a train crew may be laid off for an hour and a half at one point to suit the convenience or necessities of the company, it may be laid off for a like period at another, and the members of the crew thus wholly deprived of any substantial period for either sleep or rest. If this crew had not been released from duty at Auburn, the members would have been compelled to remain idle until the time of departure arrived, and the release for the brief period allowed by the company permitted them to do little else. The release was of no benefit to the crew, and could subserve no substantial purpose, except to obviate the penalty imposed by law. Perhaps it cannot be said as a matter of law in all cases whether a release from duty for a fixed period of time will or will not be sufficient to break the continuity of the service. No doubt in extreme cases the court may declare as a matter of law that a given period is so short as not to break the continuity of the

service, or that another period is so long as to break the continuity of the service; but between these extremes there is a twilight zone, where the question becomes a mixed one of law and fact."

In the present case in like manner there were facts peculiar to it which in our judgment ought to be considered and given due weight in determining whether the active service break here involved was or was not one of such substantial character as to stop the continuity of the service. In the first place, the service itself—a pusher service—was one that in the nature of things was necessarily broken, so that the men could foresee and adjust themselves to its probable requirements, and could count in advance on rest times. The freight trains did not run on schedule; the work was broken into short runs, and the management or care of the train during the rest periods was not in the hands of the trainmen; the periods of rest were in a measure so regular that they could be looked forward to by the men. That they were regarded as restful periods was shown by the railroad providing rest houses at certain places, and the men securing rest places for themselves where this was not done. The men being paid full wages for these usual rest periods, both men and railroads seem to have treated them as substantial intermissions, during which the men did relax and did get that cessation from mental and physical strain which their duties necessitated. It was an exceptional state of facts, different from the regular stops incident to the usual running of trains. The difficulty was a practical administrative one, and where many factors entered into the determination of the question whether the regular rest taken by the men and provided by the company was a substantial break and cessation from the strain of overtime work.

The court below in effect held that the passage of the sixteen hours, alone and apart from all other considerations, did, as a matter of law, make the work continuous, and constituted a violation of the statute. This, in our view, was error. Whether there was a violation of the law in this particular case—and we have no other case or state of facts before us—depended on whether, as a matter of fact, there was during those sixteen hours a substantial break, one that was substantial in amount and recuperative and restful in effect. If such was the case, it broke the continuity of the strain of service. The case will therefore be remanded to the court below, with full power to receive further proofs, and, if necessary, to receive from the joint suggestion of the railroad and the officials of the Interstate Commerce Commission such help, light, and suggestion on the settlement of this administrative and practical operative question as may aid in its solution.

[2] And we take this opportunity to say, in these war times, that while it is then, and indeed at all times, the duty of courts to see to it that laws are neither violated nor relaxed, it is also their like part to see to it that in war times the courts of a country, in their administration of law, recognize the new and unusual conditions which confront them. For if the administration of the law was so rigid and inflexible as to be self-incapable of adjusting itself to the new conditions governing that to which it relates, then much of what is wrong-

ly charged against the law would be justified. It is now quite apparent that a large number of cases will arise under war conditions which never arose under peace conditions, and which were not and could not have been in view when statutes affecting transportation were passed. These questions, dormant in times of peace, become vitally acute under stress of war conditions, and no court can close its eyes to these new conditions. It therefore becomes the imperative price of successful practical railroad operation that governmental administrative officers, railroad executives, and railroad employés unite in a practical operation of both railroads and laws, so that the railroads may be operated to their full limit of ability. Moved by this practical, efficient, and patriotic spirit, they can thus fairly meet and promptly solve each particular case as it arises, and can accomplish far more than the courts can do, which in applying a rigid rule of law to one case and one instance may unconsciously work injury in many other instances arising out of the great complexity and new conditions arising under war transportation conditions.

Take this case as an example. It involves the very important operative work of getting freight trains over heavy grades by the help of auxiliary engines, a service so vital that the delay of such trains may seriously impede the real efficiency of a whole railroad system, since no continuous and interrelated movement of freight can be more effective than it is at its weakest point. Confronted by this difficulty, the railroad has attempted to meet it by means of rest houses, rest hours, and by relieving the men during such time from any work and from responsibility for the trains. In that regard, as the court below has found, the railroad acted in entire good faith, and there was no complaint by the engine pusher men, or any evidence that they were in any way overstrained. The case is one of those border line and exceptional ones, in which judges, jurors, executives of railroads, and interstate commerce officials might reasonably differ as to whether the law has been violated. Yet this question the railroad is compelled to settle for itself, and this at the risk of the imposition of heavy penalties. The multiplicity of these prosecutions for violation of this and similar statutes, the money spent and the time used by judges, district attorneys, court officers, and interstate commerce officials, and the frequent inability of courts to render any real help on the determination of such purely administrative questions, suggest the advisability of some change of method. Now, as we have said, the application of this and like statutes to railroad working conditions is obviously a practical railroad operative question. In the final analysis, the government, working through the agency of the Interstate Commerce Commission, is itself the responsible administrator. The law here involved provides that "it shall be the duty of the Interstate Commerce Commission to execute and enforce the provisions of this statute and all powers granted to the Interstate Commerce Commission are hereby extended to it in the execution of this act," so that control of the executive branch of the railroads is supervised by the Interstate Commerce Commission. Under the present practice, as it comes to the courts, alleged violations of these laws are reported by the inspectors, and prosecutions are instituted in court for the collection of penalties.

It goes without saying that such a system is capable of improvement, and that, with the full and plenary power vested in the Interstate Commerce Commission, it would seem it could be practically worked out to much better advantage for the traveling public and the employé engaged in that service, if, instead of criminal prosecutions for penalties, there was substituted the supervisory power of some one authoritatively representing the Interstate Commerce Commission, who could co-operate with the executives of the railroads, who are charged with the public duty of operating roads, and thereby the close, difficult, and border line questions, which are really the principal ones now involved in such cases, could be promptly and effectively settled without resort to courts. For example, in this case, if the railroad officials, as found by the court, were acting in entire good faith, and some official of the Interstate Commerce Commission, with supervisory power and wise discretion, joined in solving this administrative question, it would seem to us it would have been better settled than by a resort to the criminal side of the federal court.

The judgment below is reversed, and the cause remanded to the court below for further procedure.