### GRAND RAPIDS & I. RY. CO. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. March 5, 1918.)

No. 3060.

MASTER AND SERVANT ☾⚊13—RAILROADS—OPERATION—HOURS OF SERVICE ACT.

Hours of Service Act (Act March 4, 1907, c. 2939) § 2, 34 Stat. 1416 (Comp. St. 1916, § 8678), provides that no telegraph operator transmitting, receiving, or delivering orders affecting train movements shall be required or permitted to be on duty more than nine hours in any 24-hour period in towers, offices, and stations continuously operated night and day. A tower office used continuously by three operators burned, and thereafter an office at an adjacent station was used for some time; three operators being provided. The railroad company then placed a box car about the site of the old tower in the yards some distance from the station. The station then was operated only in the day; the agent operator being on duty more than 12 hours, while the operator in the box car was on duty more than 12 hours at night. *Held*, that the railroad company could not escape the provisions of the statute on the theory that the box car and station were separate offices, particularly as the station had been used as night and day office for more than a year previously, and the business conducted through the station and box car was unitary in its character.

---

☾⚊For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Error to the District Court of the United States for the Northern Division of the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Action by the United States against the Grand Rapids & Indiana Railway Company. There was a judgment for the United States, and defendant brings error. Affirmed.

James H. Campbell, of Grand Rapids, Mich., for plaintiff in error.

John E. Kinnane, U. S. Atty., of Detroit, Mich., and Philip J. Doherty and Roscoe F. Walter, Sp. Asst. U. S. Attys., both of Washington, D. C.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

WARRINGTON, Circuit Judge. The railway company seeks reversal of judgment entered against it in the District Court upon a verdict directed in favor of the United States. The action was to recover penalties for alleged violations of the first proviso to section 2 of the federal Hours of Service Act (34 Stat. 1416). The services were rendered by two of the company's telegraph operators in 1916, on March 13 to March 17, inclusive, in telegraph and telephone offices maintained by the company at Elmira station and K. S. tower, and within its yard located there. Elmira station is about three-eighths of a mile south of K. S. tower, and both are upon the main line. Upon the admitted facts the only question presented is whether, in view of the manner in which the services had been and at the times in question were performed, those places are to be regarded as two distinct offices, or as one office, within the meaning of the Hours of Service Act.

Prior to the Hours of Service Act, and until the K. S. tower was constructed and put in operation, February 25, 1906, the company used the Elmira office continuously through one agent operator from 7 a. m. to 7 p. m., and another operator from 7 p. m. to 7 a. m. From the opening of K. S. tower until May 25, 1914, when it burned down, the Elmira office was used only as a day office and by one agent operator from 7 a. m. to 7 p. m. The K. S. office was used continuously by two operators, one during the day and the other during the night, until the Hours of Service Act went into effect, March 4, 1908; it was then used continuously by three operators, each working 8 hours in the 24; this practice was continued until May 24, 1914, though, by overlapping, the hours of each operator were increased to nine. By reason of the fire the K. S. office was temporarily abolished, and during this period—that is, from May 25, 1914, to April 21, 1915—the Elmira office was again used continuously though by three operators, each working 9 hours. On April 21, 1915, day service alone was resumed at the Elmira office through an agent operator from 7 a. m. to 7:30 p. m.; and this was continued until and including the dates now in question, March 13 to 17, inclusive, 1916. When the day service was so renewed at the Elmira office, the company, through the use of a box

car, re-established a telegraph and telephone office at the site of the K. S. tower; and from that time on, and including the dates in issue herein, this box car office was used as follows: One operator served regularly from 7 p. m. to 7:30 a. m., though this was not all the service rendered there. The operator at the Elmira office, in addition to his duties there as a station agent, was compelled to keep in touch with the box car office daily, by going there himself to look after way-bills, and by giving orders over the telephone from the Elmira office to conductors and engineers, as well as receiving necessary information from them, at the box car office; the conductors and engineers, as well as the agent operator at the Elmira office, having been supplied with pass-keys to enter and use the box car office. When necessary, the train employés, such as conductors, would go from the box car office to the Elmira office to communicate personally with the agent operator in regard to orders concerning the movements of cars or trains.

Without further pursuing details, it is plain that the situation comes to this: Three operators were employed to do the work at both offices prior to the Hours of Service Act, four were required thereafter until the burning of the K. S. tower, and three were found necessary at the Elmira office alone until the box car office was put into service; but these forces were then reduced to two men, who were each required to work 12½ hours in every 24-hour period. Despite these facts, there is not the slightest showing that the work to be performed had in any respect been reduced. It is to be borne in mind, moreover, that during the time the K. S. office was abolished on account of the fire—that is, from May 25, 1914, to April 21, 1915—all the work was performed at the Elmira office alone, though with three operators. It is not explained why this plan might not have been continued.

It is certainly difficult to understand how the restoration of the K. S. tower in the form of a box car could justify the reduction made in operators and the imposition of the consequent extra service upon two men. This was not to change the service in kind, nor, as already stated, to reduce it in amount, but only to require it to be performed at points relatively in close proximity, indeed, at the old places and in the same yard, though by a force materially reduced. If, then, we consider the régime existing before the fire at K. S. tower, we find a continuous "night and day" service necessary and a suitable force to perform it; and if, on the other hand, we consider the Elmira office service alone from the date of the fire to that of the resort to the box car, we again find a continuous "night and day" service required and a force sufficient to discharge it. In the face of these conditions, it is argued for the railroad that "the stations at Elmira and K. S. tower did not constitute a single station, but were distinct stations, and that it was lawful to keep the men (man) at each station who operated the telegraph, in addition to other duties, on duty not exceeding 13 hours in the 24-hour periods." We are not impressed by this contention; its claims are in disregard of the real situation. This is shown by what is offered in support of the contention. It is said, for instance, that Elmira station is an ordinary passenger and freight depot, and the

K. S. tower is a terminal of one of the freight divisions.[1]  The difference between a passenger-freight depot and a division terminal is not helpful, since it does not show how train orders and the like were distributed between the two offices; and it is obviously important to observe and bear in mind what proportion of the orders was sent to the Elmira office. The train dispatcher was stationed at Grand Rapids, and all telegraphic orders concerning train movements on the road between Grand Rapids and Mackinaw City originated with him; it need not be said that both of the offices in question were between these points. It will be remembered that, from the time of the fire until the opening of the box car office, all orders affecting train movements to and from either Elmira station or the freight terminal in question were necessarily sent to the Elmira office, since no telegraph office was maintained at the site of the K. S. tower during that period, and, further, that no person was kept at the box car office at any period in question here to receive telegraph orders during the daytime. Thus counsel overlooks conditions which restricted the sending of telegraphic train orders through the Elmira office alone for nearly a year, and indeed thereafter as to all daytime orders of that character throughout the period of the present controversy. It is said, moreover, that the work of handling train orders at either of these stations was negligible; but here, again, the facts are ignored concerning the number of telegraph operators that had been employed for years, even at the Elmira office during the time between the fire and the opening of the box car office, to do the train order work arising through train movements at these two points.

Further, counsel insists that the K. S. tower was part of the facilities embraced in the freight terminal at that place; but this does not meet the situation. The K. S. tower was not in fact restored as a structure, nor as a "night and day" telegraph office was it possessed of an adequate force; the box car office cannot in any just sense be said to be a substitute. It is also urged that the work at each office was distinct from the work at the other. This may be conceded as to the time before the fire; the concession, however, cannot aid the defense, since we have seen that for nearly a year after the fire the entire train order services for these two points were carried on at the Elmira office alone, and that afterwards the daytime services required in respect of the box car office were conducted by the Elmira operator; and it is to be added that nothing more certainly than these facts could show the nature of the train order services. They were evidently unitary in character and susceptible of performance in one office. Considered in their entirety, the services related to the same train movements and demand-

---

[1] True, counsel states, with seeming support of the agent operator at Elmira, that this terminal includes a railroad yard extending southwardly from Boyne Hill to a point 500 feet north of Elmira; but, while there is no practical difference in a case like this between the joint use of two contiguous yards and the use of a single yard, we feel bound to accept the statement of the division superintendent, who testified in detail in respect of the yard limits, stating among other things that "the yard limit boards are placed south of Elmira and north of K. S. tower," and that "K. S. tower and the [Elmira] depot are between the yard limit boards both of them."

ed adoption of the statutory "night and day" system, with an adequate force of operators, after the introduction of the box car office as well as before. In truth, the services possessed the essential attributes of a "night and day" system (United States v. Grand Rapids & I. Ry. Co., 224 Fed. 667, 671 to 673, 140 C. C. A. 177 [C. C. A. 6]), which unerringly characterized the work performed at the two offices as in reality belonging to a single office. This feature cannot be suppressed and the "night and day" clause frustrated, simply by severance of the work and by calling the two places of performance "distinct stations"; these places are to all intents and purposes but one office—a "night and day" office. As Judge Tuttle said in the course of his charge:

"It is plain * * * that by the transfer of an operator from the depot down to the box car three-eighths of a mile away they were not creating a new tower, or two towers, or two offices, or two places or two stations," within the true intendment of the Hours of Service Act.

Furthermore, the fact that the services were for a substantial length of time all performed at the Elmira office brings the instant case well within the reason of the decision in Atchison, T. & S. F. Ry. Co. v. United States, 236 Fed. 906, 907, 908, 150 C. C. A. 168 (C. C. A. 8), which is opposed to the scheme here resorted to. That case was followed by the same court in Illinois Cent. R. Co. v. United States, 241 Fed. 667, 670, 154 C. C. A. 425, affirming decision below in the same case, 234 Fed. 433, 435; and see, in the case last cited, apposite conference ruling of the Interstate Commerce Commission.

Judgment affirmed.