## UNITED STATES v. BOSTON & M. R. R.*

(Circuit Court of Appeals, First Circuit. November 24, 1920.)

No. 1470.

1. **Master and servant ⬤�439⟩13—Stations "continuously operated night and day," within Hours of Service Act, defined.**

In Hours of Service Act, § 2 (Comp. St. § 8678), the language of the proviso, that no operator or train dispatcher shall be required or permitted to remain on duty for a longer period than 9 hours in any 24 hour period in offices or stations "continuously operated night and day," does not mean stations continuously operated during the 24 hours, but includes stations operated at night and by day during the period of service of an operator, which may include a part of the day and a part of the night.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Continuously Operated.]

2. **Master and servant ⬤�439⟩13—Railroad telegraph offices held "operated" within Hours of Service Act.**

Railroad telegraph offices, kept open with operators at the post of duty, are being "operated," within Hours of Service Act, § 2 (Comp. St. § 8678).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Operate.]

In Error to the District Court of the United States for the District of Massachusetts; James M. Morton, Judge.

Action by the United States against the Boston & Maine Railroad. Judgment for defendant, and the United States brings error. Reversed.

For opinion below, see 265 Fed. 800.

Alonzo H. Garcelon, of Boston, Mass. (Daniel J. Gallagher, U. S. Atty., of Boston, Mass., and Stacy H. Myers, of Washington, D. C., on the brief), for the United States.

George E. Kimball, of Boston, Mass., for defendant in error.

Before BINGHAM and JOHNSON, Circuit Judges, and ALDRICH, District Judge.

ALDRICH, District Judge. We have here to deal with an action at law to recover penalties sought to be imposed upon a railroad for alleged violations of a federal statute known as the Hours of Service Act—a statute which was enacted with the idea of vouchsafing to employees and to the traveling public a greater measure of protection and security.

The act in question is that of March 4, 1907 (34 Stat. 1415 [Comp. St. §§ 8677-8680]), and the security to the public, and to employees, is supposed to come through an express limitation of maximum hours of service. The idea of a maximum limitation upon hours in which telegraph and telephone operators shall be allowed to serve, in connection with train movements in any 24-hour period, we think was the paramount and leading thought of Congress.

The proviso to section 2 of the act has reference solely to the use

⬤�439⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 254 U. S. —, 41 Sup. Ct. 448, 65 L. Ed. —.

of the telegraph or telephone in connection with train movements, and it is declared that no operator in connection with such service shall be required, or permitted, to be or remain on duty for a longer period than 9 hours in any 24-hour period, in stations continuously operated night and day, nor for a longer period than 13 hours in stations operated only during the daytime, except in cases of emergency. There is no question of emergency here.

While the leading idea of the statute is the limitation of hours, Congress sought to make its purpose operative by a classification based upon night and day service. This statute provides penalties, and therefore is, perhaps, within the rule as to strict construction in respect to its interpretation; yet, it being one based upon public policy and in the interest of greater public safety, its provisions will not be so technically and narrowly defined as to destroy the leading and manifest purpose of Congress.

[1] The words "night" and "day" were apparently used in a general sense, and not in the sense that, in and of themselves, the words were to be accepted as arbitrarily decisive of a classification based strictly upon a division between night and day. This seems obvious, because the word "night," in its common acceptation, means the dark half of the day; that part of the complete day during which the sun is below the horizon; the time from sunset to sunrise; while "day" means the period during which the sun is above the horizon; the interval of light, in contradistinction to that of darkness, or to night. Century Dictionary. Neither party contends for an interpretation of the statute on lines so strict and so arbitrary as this.

The offices, or stations, in question, were Amherst and Arlington, in Massachusetts, and, according to the agreed statement of facts, the station at Arlington remained open from 5:45 in the morning to 9 in the evening, and was closed for all business from that time until 5:45 in the morning. The Amherst station was open from 6 in the morning to 9:06 in the evening, and was closed as to the other hours during the 24. There were telegraphic instruments in the stations, used for sending and receiving orders pertaining to train movements, and the employees in the office used the telegraph or telephone to that end.

[2] The District Court seems to have taken the view that it was incumbent upon the government to furnish further facts in respect to the purpose for which the stations were kept open during the evening; but we think the fact that the offices were kept open into the evening or night, and that the operators were at the post of duty, means that the offices were being operated within the sense of the term "operated" as used in this statute.

The chief difficulty under the statute results from the expression "stations continuously operated night and day"; but this again should not be taken in the strict sense, because no one contends that the expression "continuously operated" should be accepted as meaning every moment of the time, either of the night or of the day.

Contrary to the view of the District Court, we cannot accept the word "night" as the most significant word of the act. Nor can we

accept the view that the division between day and night which the statute contemplates has reference to the business day established by railroads, based upon shifts in respect to day watchman and night watchman, and similar rules and regulations of railroads.

We think the significant idea and the real purpose of Congress was to declare that telegraph and telephone operators should not be kept at the post of duty more than 9 hours out of the 24 in night and day service, and, that being the public policy sought to be enforced, that the purpose should become operative, unless the terms of the statute are so indefinite and uncertain as to defeat it.

According to the agreed statement in the case before us, the operators were relieved from duty for certain periods. But still the hours of service during the 24 exceeded 9 hours, and we think the reliefs under a description so general as that of the agreed facts should be viewed as negligible intermissions (United States v. Grand Rapids & I. R. Co., 224 Fed. 667, 140 C. C. A. 177) or as said in United States v. Atchison, T. & S. F. R. Co., 220 U. S. 37, 44, 31 Sup. Ct. 362, 55 L. 361, "trifling interruptions," not to be considered, and not as such rest from the strain of excessive hours of duty as to defeat the operation of the statute, which declares that no operator shall be permitted to remain on duty for a longer period than 9 hours in any 24.

While the act in question provides for suits by the United States for recovery of the penalties provided, its enforcement is largely committed to the Interstate Commerce Commission, because it is expressly provided that such commission shall execute and enforce its provisions, and all powers are extended to such commission, together with the power to extend the period within which common carriers shall comply with its provisions, and therefore, while interpretations and regulations of the Interstate Commerce Commission are not conclusive upon courts, in view of the concurrent power and responsibility contemplated by the statute, due weight should be given to the interpretations of its terms by that tribunal. Upon conference, that commission has interpreted the phrase "continuously operated night and day" as applying to all offices, places, and stations operated during a portion of the day and a portion of the night.

The offices in question were operated, in one instance, a part of the daytime and until 9:06 p. m., and the other a part of the daytime and until 9 p. m. (at one station in March and at the other in May), and therefore must be viewed as stations operated at least into a portion of the night.

In United States v. Atchison, T. & S. F. R. Co., 220 U. S. 37, 31 Sup. Ct. 362, 55 L. Ed. 361, the Corwith station, in the outer limits of Chicago, was shut from 10 to 3 by day and by night, but open the rest of the time.

Mr. Justice Holmes, who writes the opinion, suggestively observes:

" * * * If it be conceded that Corwith was a place continuously operated night and day, as there are strong reasons for admitting."

And again:

"The antithesis is between places continuously operated night and day and places operated only during the daytime. * * * We think that the

government is right in saying that the proviso is meant to deal with all offices, and if so, we should go farther than otherwise we might in holding offices not operated only during the daytime as falling under the other head * * * and it is possible that even three·hours by night and three hours by day would not exclude the office from all operation of the law, and to that extent defeat what we believe was its intent."

As already observed, in effect, we do not accept the expression "stations continuously operated night and day" as meaning stations operated continuously throughout 24 hours, but as stations continuously operated night and day during the period at which the operator is at his post. And in this view, if the period covered by the service is continuous, and is part of the time by night, and part by day, it would be service within the meaning of the statute, as we think, at a station continuously operated night and day.

The 13-hour provision relates to situations where the place of duty is operated only during the daytime. The service at Amherst and Arlington was not within the terms of the 13-hour provision, because manifestly the stations were operated, during the period of service in question, partly by day, and, as the time was March and May, something like 3 hours into the night as night is viewed under the standard division of time as between day and night, and by the commonly accepted understanding as to what the words "night" and "day" mean. Therefore, not being within the terms in respect to stations operated only during the daytime, the service in question would fall into the 9-hour prohibited class, or that part of the statute fails in its purpose.

This provision as to continuous operation 'night and day has been well reasoned about in two of the Circuit Courts of Appeals—first, in the Fourth Circuit, in United States v. Atlantic Coast Line R. Co., 211 Fed. 897, 128 C. C. A. 275, and again, in the Sixth Circuit, in United States v. Grand Rapids & I. Ry. Co., 224 Fed. 667, 140 C. C. A. 177 In both of these cases the view which we hold is fully sustained.

The substance and sum of the cases in the Fourth and Sixth Circuit is clearly and pointedly set forth in a brief concurring opinion by Judge Woods in the case in the Fourth Circuit, where he says:

"The defendant contends that 'continuously' means without cessation, and that the offices, etc., 'continuously operated night and day,' can only include places operated without cessation through the night and day. The context and the purpose of the statute shows that this is not the sense in which the words were used. * * * If the defendant's construction were adopted, it would cover only day offices and offices operated throughout the day and night, leaving out the offices operated during the day and into the night. * * * The statute assumes that all offices will be operated during the daytime, and for those operated during the daytime only it makes the 13-hour requirement; for those which are operated during the daytime with a continuance of operation into the night it makes the 9-hour requirement. The office at Bennettsville was in operation during the daytime, with continuance into the night, and therefore falls under the 9-hour class."

Our conclusion, in this case, is that, as the day and night service exceeded 9 hours, it was service prohibited by this public safety statute.

The judgment of the District Court must therefore be vacated, for further proceedings not inconsistent with this conclusion.

Judgment of the District Court reversed, with costs to the plaintiff in error.