## UNITED STATES v. BALTIMORE & O. R. CO.

### Civ. No. 1303.

District Court, D. Maryland.
June 24, 1942.

T. B. Harrington, Asst. U. S. Atty., and James O. Tolbert, of Washington, D. C., for Interstate Commerce Commission.

Allen S. Bowie, John S. Stanley, and Kenneth H. Ekin, all of Baltimore, Md., for defendant.

COLEMAN, District Judge.

This is a suit by the Government for recovery of penalties against the Baltimore & Ohio Railroad Company, for alleged violations of Section 2 of the Hours of Service Act of March 4, 1907, 45 U.S.C.A. § 62, in that the railroad employed certain extra yardmasters who, while relieving regular yardmasters, remained on duty for periods longer than that permitted by the Act.

Section 2 of the Act is as follows: "It shall be unlawful for any common carrier, its officers or agents, subject to this chapter to require or permit any employee subject to this chapter to be or remain on duty for a longer period than sixteen consecutive hours, and whenever any such employee of such common carrier shall have been continuously on duty for sixteen hours he shall be relieved and not required or permitted again to go on duty until he has had at least ten consecutive hours off duty; and no such employee who has been on duty sixteen hours in the aggregate in any twenty-four-hour period shall be required or permitted to continue or again go on duty without having had at least eight consecutive hours off duty: *Provided, That no operator, train dispatcher, or other employee who by the use of the telegraph or telephone dispatches, reports, transmits, receives, or delivers orders pertaining to or affecting train movements shall be required or permitted to be or remain on duty for a longer period than nine hours in any twenty-four-hour period in all towers, offices, places, and stations continuously operated night and day, nor for a longer period than thirteen hours in all towers, offices, places, and stations operated only during the daytime, except in case of emergency, when the employees named in this proviso may be permitted to be and remain on duty for four additional hours in a twenty-four-hour period on not exceeding three days in any week:* Provided further, The Interstate Commerce Commission may after full hearing in a par-

ticular case and for good cause shown extend the period within which a common carrier shall comply with the provisions of this proviso as to such case." The proviso which we have italicized is the part of the section applicable to the present case, and which it is claimed has been violated.

The facts in the case have been, for the most part, stipulated by agreement of counsel, but are supplemented in certain respects by testimony taken in open court of two of the railroad's employees. The material facts may be summarized as follows: The railroad operates at Cumberland, Maryland, two freight yards known as the westbound yard and the eastbound yard, in each of which is located a yardmaster's office, equipped with telephones for use by the yardmasters in charge of the respective yards. Both the yards and the yardmasters' offices are operated on a twenty-four hour basis. The yardmaster's office for the westbound yard is located in a separate building from that occupied by defendant's general offices at Cumberland and at a considerable distance therefrom; while the yardmaster's office for the eastbound yard is even further away.

Near Cumberland for a distance of approximately three miles between two points on the railroad's right-of-way known as Evitts Creek Interlocking and Viaduct Interlocking, the railroad has only four tracks which are laid in a valley with heavy curves, the topography interfering with the laying of a more adequate number of tracks. Formerly, all routing of trains between the two points just mentioned was handled in the orthodox manner by the train dispatcher, but as traffic became heavier, in order to expedite trains which it was found necessary to move either east or west against the normal direction of train movement, that is, in the reverse direction to the normal use of the tracks, the routing of such trains was placed in the hands of the westbound yardmaster.

The method of control through the westbound yard of this so-called reverse movement of trains is as follows: If such movement is westbound, the westbound yardmaster telephones to the train operator who, in order to save time, telephones to the switchman and thereupon the operator makes out a written order, signs his own name on it as well as the names of the yardmaster and the switchman, and then gives a copy of it to the engineer of the train that is waiting to pass against the current of

traffic. After the train has cleared the switch, the switchman reports this fact to the operator, having already made out an order similar to that executed by the operator. If the movement against the current of traffic is eastbound, because of his greater proximity to such movement, the westbound yardmaster executes the order himself, instead of having the operator do it, and hands it to the engineer of the train that is to pass. Both the operator and the switchman involved in this operation perform substantially the same duties. That is, they both set the ground switches by hand and it is conceded that they both come under the nine-hour provision of Section 2 of the Act.

The two extra yardmasters involved in the present controversy had nothing to do with dispatching trains that moved in normal directions. Such movement is controlled by the train dispatcher. Also, while during the periods here in question, these two extra yardmasters performed duties in the eastbound yard as well as in the westbound yard, they did not telephone or otherwise give any orders from the eastbound yard for train movement.

The regular yardmasters for whom these men were substituting were permitted to work only eight hours in a twenty-four-hour period; that is to say, one hour less than the number stipulated in the proviso of Section 2 of the Act upon which the government is here relying. These regular yardmasters are allowed two days off every month and it was during such off days that the two extra yardmasters involved in the present controversy were substituting for them. A typical example of the period worked by these extra yardmasters is as follows: They would come on at 4 p.m. and work until midnight when they would relieve the regular yardmasters and then would continue on until 8 o'clock in the morning. While this resulted in economy of wages, the eight-hour limitation for regular yardmasters was put into effect by the railroad as a union measure; that is to say, at the instance of the Association of Regular Yardmasters, the railroad not conceding that a regular yardmaster, any more than an extra yardmaster, is an "operator" or "train dispatcher" within the meaning of the proviso in Section 2 of the Act.

The telephonic communications given by the extra yardmasters involved in the present controversy were frequently not trans-

mitted over the telephones located in their office but they used other telephones located at some other point in the westbound yard. During no twenty-four hour period in question were they within their own office more than about 30% of the time, being engaged during the remaining time in various duties in and about the yard which were not related to any telephonic or other form of regulation of train movements. In the course of each twenty-four hour period only about 10% of the use made of the telephone in the westbound 'yard represented use in connection with train movements, and the average number of train orders handled by these two extra yardmasters in any one twenty-four hour period was seven, and the maximum number, thirteen. They were on duty, however, in each of the nine instances of alleged violations sixteen hours in a twenty-four hour period.

It is the contention of the Government that each of the extra yardmasters involved in the present suit, by virtue of transmitting, by telephone, train orders governing the movement of trains engaged in the transportation of interstate traffic, or being expected to handle such orders in such way if it became necessary, was an "operator" within the meaning of the proviso in section 2 of the Act and therefore could lawfully be on duty only nine hours in any twenty-four hour period in any tower, office, place or station continuously operated night and day; that these extra yardmasters' offices at Cumberland were within the enumeration of such places contained in the proviso of Section 2 of the Act; and that since it is admitted that their yards and offices were continuously operated night and day, their hours of employment were governed by the limitations in the Act.

On the other hand the railroad contends that the Act has not been violated because (1) a yardmaster is not included within the meaning of "operator, train dispatcher, or other employee" who uses the telegraph or telephone pertaining to or affecting train movements; and (2) the post of duty of a yardmaster excludes him from the classification of those employed in "towers, offices, places, and stations continuously operated night and day."

■ The purpose of the statute now before us "is to promote safety in operating trains by preventing the excessive mental and physical strain which usually results from remaining too long at an exacting task." Chicago & Alton R. R. Co. v. United States, 247 U.S. 197, 199, 200, 38 S. Ct. 442, 443, 62 L.Ed. 1066; Baltimore & Ohio R. R. Co. v. Interstate Commerce Commission, 221 U.S. 612, 619, 31 S.Ct. 621, 55 L. Ed. 878. In the Chicago & Alton case just referred to, the Supreme Court decided that a switch tender on duty in switch shanties, within a railroad yard, which were operated continuously day and night, and where by use of the telephone he received and transmitted orders from the yardmaster to engine and train crews pertaining to train movements through the yard, was within the class described in the proviso of Section 2 of the Hours of Service Act, and that therefore his work day was limited to nine hours.

In that case, the work of the switch tender was to throw switches, relieve yard, train and engine crews of this work, and to avoid delays to trains moving through the yard. Telephones were used to permit the yardmaster, who directed all yard movements, to keep in closer touch with such movements and to issue instructions or orders to yard, train or engine crews, including the switch tender in question, as to the handling of cars or trains, or as to any other work that he might desire performed. In holding that the Act had been violated by permitting such switch tender to remain on duty more than nine hours during a twenty-four hour period, the Court said at page 200 of 247 U.S., at page 443 of 38 S.Ct., 62 L.Ed 1066: "The individuals within the ambit of the proviso's pertinent provisions are marked by the nature of service performed—an 'operator, train dispatcher, or other employé who by the use of the telegraph or telephone dispatches, reports, transmits, receives, or delivers orders pertaining to or affecting train movements.' And the railroad is forbidden to permit one performing such service in 'towers, offices, places and stations continuously operated night and day' to remain on duty therein longer than nine hours in twenty-four. Both the post of duty and character of work are essential elements. If, in due course of his work, an employé while in any of the locations specified uses the telegraph or telephone for sending or receiving messages concerning train movements he may not lawfully remain on duty therein exceeding nine hours during any twenty-four hour period, except in case of emergency.

"Here, the facts disclose the switch tender on duty for twelve consecutive hours in a shanty continuously operated night and day where, by the use of the telephone, he received and delivered orders pertaining to train movements—not mere switching movements within the yard; and in such service mental and physical alertness are of great importance. By permitting this, the railroad violated both language and purpose of the act."

Later, in Atchison, etc., Ry. v. United States, 269 U.S. 266, 46 S.Ct. 109, 70 L.Ed. 268, the Supreme Court decided that the proviso in Section 2 of the Hours of Service Act did not apply to a yardmaster whose duties included the breaking up and making up of trains, the prompt movement of cars, and general charge of the defendant railroad company's Corwith Yard, in Chicago, the tracks into which crossed the tracks of the Chicago & Alton Railroad. In the performance of these duties the yardmaster used the telephone, although not exclusively or even usually, and his telephone calls did not exceed twenty-four a day. When cars of either road were to enter the Corwith Yard, the tower man telephoned to the yardmaster to find out whether he was in condition to receive them; and when cars were to leave the yard, the yardmaster telephoned to the tower man to know if they could pass, but the yardmaster had no authority over the tower man—his decisions were not actually binding upon the tower man although generally followed; and conversely the tower man had no actual authority over the yardmaster. In holding that employment of this yardmaster for more than nine hours in a twenty-four hour period did not violate the Act, the Court said at page 268 of 269 U.S., at page 110 of 46 S.Ct., 70 L.Ed. 268: "The yardmaster's duties extend to the breaking up and making up of trains, the prompt movement of cars, and general charge of the yard. The telephoning, although a part of them, was an incidental part only, and a small one. Twenty-four calls a day seems a too liberal estimate. The messages were not orders, although they generally would govern the decision of the tower man. His decision was not obedience to any authority of or represented by the yardmaster. The movements that the messages affected were not of the kind that required the greatest solicitude, even when they were train movements, which, of course, was not always the case. The office hardly could be described as 'continuously operated,' when the yardmaster was not in it much more than half the time, but was about the yard attending to other things. Taking all the facts into account we are of opinion that the employment of the yardmaster for more than nine hours was not within the evil at which the statute was aimed and that the ruling to the contrary was wrong."

The Government relies upon the Chicago & Alton case and the railroad company upon the Atchison case. We have some difficulty in completely reconciling the two decisions. The opinion in the Atchison case rendered in 1925, that is seven years after the Chicago & Alton decision, unfortunately gives no comparative analysis of the facts in the earlier case, Justice Holmes, who delivered the opinion of the Court, merely citing the Chicago & Alton case in quoting from it the underlying purpose of the statute.

Had these two decisions been rendered in reverse order, it might be more difficult to escape the conclusion that the broad language of the Chicago & Alton case, which we have quoted above, would require a holding that the facts in the present case indicate that the Act has been violated. However, in the earlier opinion delivered by Mr. Justice McReynolds, the Court is careful to point out that "Both the post of duty and character of work are essential elements." The opinion then states that "If, in due course of his work, an employé while in any of the locations specified uses the telegraph or telephone for sending or receiving messages concerning train movements he may not lawfully remain on duty therein exceeding nine hours during any twenty-four hour period, except in case of emergency." (Italics inserted.) Continuing, the Court finds as a fact that the shanty in which the switch tender had his post of duty was "continuously operated night and day" within the meaning of the Act, in addition to finding that the character of the switch tender's work was within the types of work covered by the Act. However, when we turn to the later, the Atchison decision, we find therein the statement at page 268 of 269 U.S., at page 110 of 46 S.Ct., 70 L.Ed. 268, that "The office [of the yardmaster] hardly could be described as 'continuously operated,' when the yardmaster was not in it much more than half the time, but was about the yard attending to other things." Therefore, since it is an undisputed fact in the case

now before us that the yardmasters were not within their own office more than approximately 30% of the time, being about the yard attending to other things than train movements during the rest of the time, that is to say, they were in their office considerably less than the amount of time so spent which the Court in the Atchison case said was not enough to constitute the office as one "continuously operated" within the meaning of the Act; and also since, in the Atchison case, the yardmaster's train movement telephone calls at times aggregated nearly twice as many, in a given day, as did those of the yardmasters in the present suit, the conclusion seems inescapable that however closely the facts in the present case may in some respects approach the facts in the Chicago & Alton case, this Court is bound to give to the railroad the full benefit of the language in the Atchison case.

Apparently, when that case was before both the District Court and the Circuit Court of Appeals, it was treated as a concessum that the Corwith office was "continuously operated," within the meaning of the statute. See United States v. Atchison, etc., Ry. Co., D.C., 298 F. 549; Atchison, etc., Ry. Co. v. United States, 7 Cir., 3 F.2d 138, 139. The District Court found only one question in the case, i.e., whether the telephone messages, which the yardmaster received or transmitted, were "orders" within the meaning of the statute, and ruled that they were. The Circuit Court of Appeal found two questions in the case, i.e., the one just stated, upon which it agreed with the District Court; and the question whether the yardmaster was an "operator, train dispatcher, or other employee", within the meaning of the statute, and answered this question also in the affirmative. But, the Supreme Court, in reversing on the first of these questions, also reversed the lower courts on the meaning of the words "continuously operated." Therefore, since in the Atchison case the Supreme Court has ruled that a yardmaster's office does not meet the statutory requirement of continuous operation when a yardmaster is not in his office "much more than half the time", we are not at liberty to conclude that the Supreme Court did not intend that this definition of the phrase "continuously operated" should be equally applicable when, as must be conceded in the present case, the yardmasters' directions, unlike the directions given by the

yardmaster in the Atchison case, were, in fact, "orders", requiring compliance therewith by those to whom these directions were given.

The conclusion here reached is supported by the fact that, in so far as we are aware, most, if not all, of the lower court decisions wherein the Act has been held to have been violated, involve employees who were engaged continuously at *fixed* locations. See for example, United States v. Atlantic Coast Line R. R. Co., 4 Cir., 211 F. 897; Atchison, Topeka & Sante Fe Ry. Co. v. United States, 8 Cir., 236 F. 906; United States v. Atlanta Terminal Co., D.C., 30 F.2d 109, involving telegraph operators; Delano v. United States, 7 Cir., 220 F. 635; involving a combination train dispatcher and ticket seller; and Chicago, Rock Island & Pacific Ry. Co. v. United States, 7 Cir., 226 F. 27, involving a switchman.

The distinction is forcibly disclosed by such cases as United States v. Florida East Coast R. Co., 5 Cir., 222 F. 33, where it was held, and we think rightly, that the conductor of an interstate train, who was required during given runs to stop at stations to report, transmit, receive and deliver orders pertaining to or affecting his train movements, was not embraced within the terms of the Act. Admittedly the case of the conductor is simpler than that of the yardmasters in the present case, because, if the former were declared to be embraced by the Act, to be consistent it would presumably be necessary to rule that the Act would then sweep into its fold countless railroad employees, including operating officials such as Vice Presidents in charge of operations, because of their personal use of the telephone for even the most occasional transmission of orders for train movements. Nevertheless, we feel that the governing principle is the same as in the present case, when the precise language of the Supreme Court's opinion in the Atchison case is applied. To conclude, we rely upon what we understand to be the plain meaning and effect of that decision unless and until modified by the Supreme Court itself. It is not for us either to restrict or extend it.

There has been no later decision by the Supreme Court to aid us in the statute's application. Counsel for the Government in the present case have stated that it is the first one to be prosecuted involving a yardmaster since the decision in the Atchison case. Admittedly there is no logic in

attempting to differentiate, in terms of the statute, between the number of hours per day that the extra yardmasters in the present suit are permitted to work and the number which the regular yardmasters, whom they relieved, are permitted to work. While restricting the latter to eight hours in twenty-four, we do not understand that the railroad attempts to defend this distinction by the statute or otherwise, except to say that its action is the result of a labor union requirement, and concludes nothing in the present controversy. Upon legal principle, this must be true.

For the reasons given, judgment must be for the defendant upon all nine of the causes of action embraced in the complaint.