## UNITED STATES v. BALTIMORE & O. R. CO.

### No. 5031.

Circuit Court of Appeals, Fourth Circuit.

Feb. 13, 1943.

James O. Tolbert, Sp. Asst. to U. S. Atty., of Washington, D. C. (Bernard J. Flynn, U. S. Atty., and T. Barton Harrington, Asst. U. S. Atty., both of Baltimore, Md., on the brief), for appellant.

John S. Stanley, of Baltimore, Md. (Allen S. Bowie, Roger A. Clapp, and Hershey, Donaldson, Williams & Stanley, all of Baltimore, Md., on the brief), for appellee.

Before PARKER and DOBIE, Circuit Judges, and HAYES, District Judge.

DOBIE, Circuit Judge.

This is a civil action brought by the United States (upon the instigation of the Interstate Commerce Commission) against the Baltimore & Ohio Railroad Company (hereinafter called B. & O.) to recover penalties for alleged violations by B. & O. of the Hours of Service Act (hereinafter called the Act), 45 U.S.C.A. §§ 61–64.

The individual employees here in question were two extra yardmasters in the Westbound Yard of the B. & O. at Cumberland, Maryland. Most of the facts were stipulated, though some oral testimony was introduced at the time before Judge Coleman, sitting without a jury, in the United States District Court. Judge Coleman found for the B. & O. and an appeal to our court has been taken by the United States. The opinion below will be found in 45 F. Supp. 623, 624.

We are here concerned only with a part of section 62 of the Act, reading as follows: "* * * *Provided,* That no operator, train dispatcher, or other employee who by the use of the telegraph or telephone dispatches, reports, transmits, receives, or delivers orders pertaining to or affecting train movements shall be required or permitted to be or remain on duty for a longer period than nine hours in any twenty-four-hour period in all towers, offices,

places, and stations continuously operated night and·day, nor for a longer period than thirteen hours in all towers, offices, places, and stations operated only during the daytime, * * *."

Judge Coleman thus admirably summarized the material facts:

"The railroad operates at Cumberland, Maryland, two freight yards known as the westbound yard and the eastbound yard, in each of which is located a yardmaster's office, equipped with telephones for use by the yardmasters in charge of the respective yards. Both the yards and the yardmasters' offices are operated on a twenty-four hour basis. The yardmaster's office for the westbound yard is located in a separate building from that occupied by defendant's general offices at Cumberland and at a considerable distance therefrom; while the yardmaster's office for the eastbound yard is even farther away.

"Near Cumberland for a distance of approximately three miles between two points on the railroad's right-of-way known as Evitts Creek Interlocking and Viaduct Interlocking, the railroad has only four tracks which are laid in a valley with heavy curves, the topography interfering with the laying of a more adequate number of tracks. Formerly, all routing of trains between the two points just mentioned was handled in the orthodox manner by the train dispatcher, but as traffic became heavier, in order to expedite trains which it was found necessary to move either east or west against the normal direction of train movement, that is, in the reverse direction to the normal use of the tracks, the routing of such trains was placed in the hands of the westbound yardmaster.

"The method of control through the westbound yard of this so-called reverse movement of trains is as follows: If such movement is westbound, the westbound yardmaster telephones to the train operator who, in order to save time, telephones to the switchman and thereupon the operator makes out a written order, signs his own name on it as well as the names of the yardmaster and the switchman, and then gives a copy of it to the engineer of the train that is waiting to pass against the current of traffic. After the train has cleared the switch, the switchman reports this fact to the operator, having already made out an order similar to that executed by the operator. If the movement against the current of traffic is eastbound; because of his greater proximity to such movement, the westbound yardmaster executes the order himself, instead of having the operator do it, and hands it to the engineer of the train that is to pass. Both the operator and the switchman involved in this operation perform substantially the same duties. That is, they both set the ground switches by hand and it is conceded that they both come under the nine-hour provision of Section 2 of the Act.

"The two extra yardmasters involved in the present controversy had nothing to do with dispatching trains that moved in normal directions. Such movement is controlled by the train dispatcher. Also, while during the periods here in question, these two extra yardmasters performed duties in the eastbound yard as well as in the westbound yard, they did not telephone or otherwise give any orders from the eastbound·yard for train movement.

"The regular yardmasters for whom these men were substituting were permitted to work only eight hours in a twenty-four hour period; that is to say, one hour less than the number stipulated in the proviso of Section 2 of the Act upon which the government is here relying. These regular yardmasters are allowed two days off every month and it was during such off days that the two extra yardmasters involved in the present·controversy were substituting for them. * * *

"The telephonic communications given by the extra yardmasters involved in the present controversy were frequently not transmitted over the telephones located in their office but they used other telephones located at some other point in the westbound yard. During no twenty-four hour period in question were they within their own office more than about 30% of the time, being engaged during the remaining time in various duties in and about the yard which were not related to any telephonic or other form of regulation of train movements. In the course of each twenty-four hour period·only about 10% of the use made of the telephone in the westbound yard represented use in connection with train movements, and the average number of train orders handled by these two extra yardmasters in any one twenty-four hour period was seven, and the maximum number, thirteen. They were on duty, however, in each of the nine instances of alleged violations sixteen hours·in a twenty-four hour period."

834

Two decisions of the Supreme Court play a large part in the instant controversy. Chicago & A. R. Co. v. United States, 1918, 247 U.S. 197, 38 S.Ct. 442, 62. L.Ed. 1066 (hereinafter called the Alton case), and Atchison, T. & S. F. R. Co. v. United States, 1925, 269 U.S. 266, 46 S.Ct. 109, 70 L.Ed. 268 (hereinafter called the Santa Fe case). In oral argument before us, the United States relied heavily on the earlier Alton case; the B. & O. based its argument largely upon the later Santa Fe case. Judge Coleman, we think, based his decision almost entirely upon the decision in the later Santa Fe case. The opinions in these two cases are quite brief. In the Alton case, the earlier opinion of Mr. Justice McReynolds occupies just three pages in the official reports; the opinion of Mr. Justice Holmes in the Santa Fe case is even shorter, occupying just one and three-quarters pages. Mr. Justice McReynolds devotes less than eight lines to the purpose of the Act. The only mention of the Alton case by Mr. Justice Holmes is to quote with approval three and one-half lines of the opinion of Mr. Justice McReynolds outlining the purpose of the Act.

■ Only a single question is presented in the instant case for our decision. We are called on to decide, and we do decide, solely whether these two extra yardmasters, under the somewhat distinctive facts and rather unique circumstances here found, came within the purview and ambit of the Act. We do think they so come, and we proceed to set forth the reasons for this legal faith that is in us.

B. & O. strongly contends that these extra yardmasters are without the scope of the Act. For this contention, B. & O. advances two reasons:

"1. The yardmaster in question is neither an 'operator, train dispatcher or other employee who by the use of the telegraph or telephone dispatches, reports, transmits, receives or delivers orders pertaining to or affecting train movements,' within the meaning of the statute.

"2. The yardmaster in question was not employed in 'towers, offices, places, and stations' within the meaning of the statute'."

These reasons will now be discussed—the first, under the caption, "The Duties of the Extra Yardmasters", the second, under the caption, "The Places in Which the Extra Yardmasters Were Employed."

1. *The Duties of the Extra Yardmasters.*

■ B. & O. insists that the messages transmitted by telephone by these yardmasters as to westbound traffic against the current (that is, westbound traffic over tracks normally used solely for eastbound traffic) were not "orders" under the Act. We cannot agree. True, in the Santa Fe case, the messages were held not to be orders, but here the situation is quite different.

The opinion of Circuit Judge Evans of the Circuit Court of Appeals in Atchison, L. & S. F. R. Co. v. United States, 7 Cir., 3 F.2d 138, thus describes the procedure in the Santa Fe case: "When the towerman wanted to send a train into the yards, he 'phoned the yardmaster over a wire used for that purpose and so informed him. If the tracks in the yards were sufficiently clear to admit the entry of the train, the yardmaster would reply, 'Let her come.' If the tracks in the yard were full, the yardmaster would so advise the towerman, or, as illustrated in the record, he would say, 'Let her follow up No. 39.' In sending out trains from the yards a similar practice prevailed. The yardmaster would advise the towerman over the 'phone that he had a train 'made up' ready to 'go out.' The towerman would reply, 'Let her come,' or 'Hold her until I get No.— out of the way,' depending upon the condition of the tracks outside the yards, etc."

There the yardmaster essentially *gave information* to the towerman, who was in complete control. And, further, even this information furnished by the yardmaster related entirely to the situation in the yard. That yardmaster was a yardmaster, "only that and nothing more."

Quite different was the situation as to these extra yardmasters of the B. & O. Their jurisdiction covered three miles of main-line track, not in the yard, between the Evitts Creek Interlocking and the Viaduct Interlocking points. Again, the agreed statement of facts specifically states: "Train movements between these points are under the *jurisdiction* of the yardmaster at Westbound Yard who *authorizes train movements against the* current of traffic." (Italics ours.)

A typical message telephoned by the yardmaster to the Evitts Creek Interlocking operator is also thus set out in the stipulation:

"To Conductor & Engineer Opr., Balto. St.

Ex. 7207 West has right over opposing trains on Eastbound Freight track from Virginia Lane to Baltimore St. The last train using Eastbound Freight track was 6100 East clear at 151 P. M.

(Signed) W. L. Smith,
Yardmaster."

We are convinced that experienced trainmen would promptly and properly characterize this message as (to use the precise words of the Act) "orders pertaining to or affecting train movements."

Judge Coleman expressly held: "in the present case, the yardmasters' directions, unlike the directions * * * in the Atchison case, were, in fact, 'orders', requiring compliance therewith by those to whom these directions were given". There is, we think, more than ample evidence' to support this direct finding.

Nor are the directions of the yardmaster here any the less orders because (as is asserted in the B. & O. brief) "if for any reason the movement against the current of traffic could not be made the operator at Evitts Creek tower would cancel the order and notify the yardmaster." Under the Act, an order does not have to be absolute, immutable and irrevocable. The operator in the tower had knowledge of train movements not possessed by the yardman. It is, and properly should be, the approved practice of railroads to make train orders fool-proof as far as this is humanly possible by requiring (in some instances, at least) the orders of one employee to be checked (or even double-checked) by another employee or by other employees. Normally here, as we read the record, the directions of the yardmaster, as to westbound traffic against the current, were controlling and were obeyed; only in exceptional instances were these directions cancelled by the tower operator.

In the Alton case, Mr. Justice McReynolds seemed to give a broad interpretation to the word "orders" when he wrote (247 U.S. at page 200, 38 S.Ct. at page 443, 62 L.Ed. 1066) that an employee came within the Act: "If, in due course of his work, an employé while in 'any of the locations specified uses the telegraph or telephone *for sending or receiving messages concerning train movements.*" On the same page, he also distinguished "orders pertaining to train movements—not mere switching movements within the yard."

Finally, (in this particular connection) in the Sante Fe case, 269 U.S. at page 268, 46 S.Ct. at page 110, 70 L.Ed. 268, Mr. Justice Holmes wrote: "The movements that the messages affected were not of the kind that require the greatest solicitude." This could hardly be said of the instant case, when the train movements were against the current of traffic, over the main line of a great railroad at a place where the number of tracks between the towers was admittedly too few. It is only fair to the railroad to point out that the laying of extra tracks was impracticable owing to the contours of the ground and the physical configuration of the terrain. That circumstance, however, in no way served to minimize the attendant danger. And, in his oral testimony in this case, Mr. Reed, Terminal Train Master of the B. & O. at Cumberland, continually referred to these directions, given over the telephone by the yardmasters, as *orders.*

Nor are we impressed by the contention that these yardmasters are without the ambit of the Act because their work in transmitting messages concerning the movements of the trains in question occupied only a small part of their time or attention, and was thus merely "incidental" to their duties as yardmasters. It is true that the extra yardmaster here was only in his office about 30% of the time, the rest of his time being devoted to various duties. Only about 10% of the use of the telephone in the west-bound yard represented use in connection with train movements. The average number of train orders handled by the extra yardmaster in a twenty-four-hour period was seven, the maximum number was thirteen.

There are isolated expressions in the opinion of District Judge Maxey, speaking for the Circuit Court of Appeals of the Fifth Circuit, in United States v. Florida East Coast R. Co., 222 F. 33, which lend some support to this contention of B. & O. But these isolated expressions have little weight in the light of the actual facts and real decision in that case. There the employee was a *train conductor.* And, as to him, we agree with Judge Maxey (222 F. at page 36): "His primary and chief duty requires him to *look after his train,* and stopping at a station to transmit or receive an order, *affecting his immediate train,* is a mere incidental service, which cannot operate to classify him as a telegraph or telephone operator or train dispatcher."

836

(Italics ours.) See, also, involving a train conductor, United States v. Chicago, M. & P. S. R. Co., D.C.Idaho, 219 F. 1011.

This contention of the B. & O., we think, is very effectively answered in the opinions of Circuit Judge Knapp in United States v. Atlantic Coast Line R. Co., 4 Cir., 211 F. 897; Circuit Judge Baker in Delano v. United States, 7 Cir., 220 F. 635; and Circuit Judge Mack in Chicago, R. I. & P. R. Co. v. United States, 7 Cir., 226 F. 27. See, also, the authorities cited in these three opinions. Particularly are we impressed by this language from Judge Mack's opinion in this last case (226 F. at page 30): "We cannot, however, agree that the words 'other employé who by the use,' etc., transmits such orders, are to be qualified by an implied limitation to those whose primary and principal duty is thus described. The remedial purposes of this act, to protect human life and to promote railroad efficiency, demands that despite its penal character its provisions shall be construed and the intent of Congress found from the language actually used, interpreted according to its fair and obvious meaning. Congress may well have deemed it unsafe to permit employés whose duty it is, not primarily or principally, but ordinarily and habitually, to transmit such important orders, and in doing so to exercise whatever measure of skill, care, alertness, and attention the use of either telegraph or telephone requires, to work 16 hours, however simple or nonfatiguing their ordinary tasks may be."

Whether it be called *primary* or *secondary* (which we think is unimportant), it was yet an integral, responsible and definite part of the *daily* duty of these extra yardmasters to transmit over the telephone orders affecting the movements of all westbound traffic through the westbound yard, against the current, over several miles of the main-line track of a busy railroad. These men were called extra yardmasters. As a fact, they were essentially yardmasters; but, with respect to these westbound train movements against the traffic, they were, *pro hac vice,* also train dispatchers. It is very significant here as Judge Coleman said in his opinion: "Formerly, all routing of trains between the two points just mentioned *was handled* in the orthodox manner *by the train dispatcher,* but as traffic became heavier * * * the *routing of such trains was placed* in the hands of the west-*bound yardmaster."* (Italics ours.) In other words, the B. & O., by this action (doubtless from eminently proper motives and for excellent reasons) converted men who had formerly been only yardmasters into men who were still yardmasters but were also, *pro hac vice* (as we have indicated) dispatchers as to westbound traffic against the current. Under these circumstances, what matters it then, from the standpoint of the Act, that these men still, under the new set-up, gave a larger part of their time and a majority of their attention to the duties inhering in their old role of yardmasters? Said Mr. Justice Van Devanter (in connection with the Safety Appliance Acts) very aptly, United States v. Chicago, B. & Q. R. Co., 237 U.S. 410, 413, 35 S.Ct. 634, 636, 59 L.Ed. 1023: "Neither is it material that the men in charge were designated as yard or switching crews, for the controlling test of the statute's application lies in the essential nature of the work done rather than in the names applied to those engaged in it." One William Shapespeake, centuries ago, expressed very much the same idea (without reference to the Hours of Labor Act) in the tragic case of Romeo v. Juliet:
"What's in a name? that which we call a rose.

By any other name would smell as sweet."

2. *The Place in which the Extra Yardmasters Were Employed.*

This, we think, presents the most difficult problem in the case before us. The words of the Act are: "in all towers, offices, places, and stations continuously operated night and day." On their face, these words seem very broad and extremely comprehensive.

In the Alton case, certainly Mr. Justice McReynolds undertook, though there was no necessity for it as to the switch tenders in that case, to outline a very broad scope for the words of the Act when he said (247 U.S. at page 200, 38 S.Ct. at page 443, 62 L.Ed. 1066): "Both the post of duty and character of work are essential elements. If, in due course of his work, an employé *while in any of the locations specified* uses the telegraph or telephone for sending or receiving messages concerning train movements he may not lawfully remain on duty *therein* exceeding nine hours during any twenty-four hour period, except in case of emergency." (Italics ours.)

Even more certain is it that Mr. Justice Holmes set out a technically specific stand-

ard in one crisp sentence from the Santa Fe case (269 U.S. at page 268, 46 S.Ct. at page 110, 70 L.Ed. 268): "The office hardly could be described as 'continuously operated,' when the yardmaster was not in it much more than half the time, but was about the yard attending to other things."

The opinion of Circuit Judge Evans, speaking in that case for the Circuit Court of Appeals, Atchison, L. & S. F. R. Co. v. United States, 7 Cir., 3 F.2d 138, which was reversed by the Supreme Court, did not even mention this phase of the case.

 Judge Coleman seems to have based his decision squarely on this sentence used by Mr. Justice Holmes. On the other hand, the contention of the United States here is: "The Santa Fe case is distinguishable from the Alton case in that in the former case the court specifically said that train orders were not handled, and since that was found to be a fact, the whole case fell, and no further argument was necessary to hold that the operators' provision of the hours of service law did not apply. The statement of the Supreme Court that the office was not continuously operated is manifestly dicta. Where an office is open 24 hours a day, the fact that the employee is not in it all the time should not be used to classify it as a 'Daytime' office." We think this contention is sound.

We append the crux of the opinion of Mr. Justice Holmes (Atchison, L. & S. F. R. Co. v. United States, 269 U.S. at page 268, 46 S.Ct. at page 110, 70 L.Ed. 268), found in the last two paragraphs of the opinion:

"The Corwith Yard lies to the South of the defendant's road, which runs East and West. Between the yard and the road, and parallel to the latter, runs the road of the Chicago & Alton Railroad, which must be crossed by cars coming from or going to the defendants' tracks to or from the yard. These crossings are controlled from a tower on the Chicago & Alton's line. When cars of either road seek to enter the yard the towerman generally telephones to the yardmaster to find out whether he is in condition to receive them, and when cars are to go out the yardmaster telephones to the towerman to know if they can pass; but the yardmaster has no authority over the towerman and his telephone either way is not conclusive of the towerman's action. Conversely the towerman has no authority over him.

"The yardmaster's duties extend to the breaking up and making up of trains, the prompt movement of cars, and general charge of the yard. The telephoning, although a part of them, was an incidental part only, and a small one. Twenty-four calls a day seems a too liberal estimate. The messages were not orders, although they generally would govern the decision of the towerman. His decision was not obedience to any authority of or represented by the yardmaster. The movements that the messages affected were not of the kind that require the greatest solicitude, even when they were train movements, which, of course, was not always the case. The office hardly could be described as 'continuously operated,' when the yardmaster was not in it much more than half the time, but was about the yard attending to other things. Taking all the facts into account we are of opinion that the employment of the yardmaster for more than nine hours was not within the evil at which the statute was aimed and that the ruling to the contrary was wrong."

We now proceed to compare the Santa Fe case with the instant case. There are, we think, many points to distinguish them. The duties, responsibilities, and particularly the powers of initiative and control, were much broader in the instant case. The procedure and practice outlined in the Santa Fe opinion fall far short of describing the situation of our extra yardmasters. This, we have already discussed.

Sentence one of the second paragraph of the opinion of Mr. Justice Holmes (quoted above) may accurately indicate the duties of the ordinary yardmaster and his Santa Fe yardmaster. As we have attempted to show, that sentence is not a complete catalogue of the duties of these extra yardmasters here, who were not only yardmasters but also *pro hac vice* train dispatchers as well.

Sentences two and three of that opinion are: "The telephoning, although a part of *them* [i. e., the duties of the yardmaster], was an incidental part only, and a *small one*. *Twenty-four calls a day* seems a too liberal estimate." (Italics ours.) In the instant case, we admit that the average number of telephone calls, which (as Judge Coleman held) rose to the dignity of *train orders* amounted to only *seven a day*. Though, in our case, the telephoning of train orders by our yardmasters occupied only a small part of their total time, we

have already shown why we think they were not *incidental* and why they bulked very *large* from every important standpoint save that of the time actually consumed in telephoning these orders.

We have previously discussed sentences four and five of the second paragraph quoted from the Santa Fe opinion: "The messages were not orders, although they generally would govern the decision of the towerman. His decision was not obedience to any authority of or represented by the yardmaster."

Again we emphasize that the instant messages, as Judge Coleman held, were *orders* as that term is understood by practical trainmen.

We have also tried to show the sheer inapplicability to the present case of sentence six: "The movements that the messages affected were not of the kind that required the greatest solicitude, even when they were train movements, which, of course, was not always the case."

This brings us to the seventh sentence of paragraph two of the Santa Fe opinion, which we deem (for the purposes of the instant case) the most important sentence in the opinion: "The office hardly could be described as *'continuously operated,'* when the yardmaster *was not in it much more than half the time,* but was about the yard attending to other things." (Italics ours.)

In this connection we must consider the next (and last) sentence of that opinion: *"Taking all the facts into account* we are of opinion that the employment of the yardmaster for more than nine hours was not within the evil at which the statute was aimed and that the ruling to the contrary was wrong." (Italics ours.)

In our case, these yardmasters were in the yardmaster's office not more than 30% of the time, though this office was their headquarters. And frequently their telephonic messages concerning train movements were transmitted over telephones located not in the yardmaster's office but at other places in the westbound yard. Potentially, the yardmaster's office was open at all hours of the day and night. There were no fixed hours during which this office was closed.

If, then, this seventh sentence be interpreted as requiring that the yardmaster must be in the office at least half of the time as an absolutely essential pre-requi-

site, standing by itself, for the application of the Act, then Judge Coleman is right and we are wrong. But we do not think that is the proper interpretation. Mr. Justice Holmes set out seriatim and in some detail (as we have shown) the many various facts and circumstances, including those set out in this sentence, that surrounded the Santa Fe yardmasters. Then, in the concluding sentence, he said: "Taking *all* the facts into account" (italics ours), the Santa Fe yardmasters fell without the ambit of the Act. We think, as he said, that his decision was based on *"all* the facts", not merely one fact alone. A decision based solely and entirely on the one fact—the amount of time actually spent within the confines of the yardmaster's office—seems to us subversive of the great purpose of the Act and, we think, defeats what seems to be the real intent of Congress.

■■■ In line with the view we have just expressed appear to be the opinions of a number of distinguished federal judges. We have already adverted to the opinion of Mr. Justice McReynolds in the Alton case. Said Circuit Judge Knapp in United States v. Atlantic Coast Line R. Co., 4 Cir., 211 F. 897, 900, 901: "The terms employed are plainly intended to include every sort of place where train orders are handled, however infrequently, by telegraph or telephone." "It is conceded that an office need not literally be kept open every minute of the 24 hours in order to be within the 9-hour restriction." And, in Atchison, T. & S. F. R. Co. v. United States, 10 Cir., 236 F. 906, 908, Circuit Judge Hook declared: "The meaning of an 'office, place or station' within the statute does not depend on foot measure, but involves other considerations as well— the character of the work performed, its scope, to what applied, how it is done, and whether, consistently with the remedial object, it is naturally separable or unitary and continuous." And District Judge Aldrich (speaking for the Circuit Court of Appeals of the First Circuit), United States v. Boston & M. R. R., 269 F. 89, 90, stated: "The chief difficulty under the statute results from the expression 'stations continuously operated night and day'; but this again should not be taken in the strict sense, because no one contends that the expression 'continuously operated' should be accepted as meaning every moment of the time, either of the night or of

the day." Even Mr. Justice Holmes seems to have taken a more liberal view in another (and earlier) case involving the same railroad. See United States v. Atchison, T. & S. F. R. Co., 220 U.S. 37, 31 S.Ct. 362, 55 L.Ed. 361. Said District Judge Maxey, in United States v. St. Louis Southwestern R. Co., D.C., 189 F. 954, 964: "The office was closed each day of 24 hours four times for the period of one hour only. The court is clearly of the opinion that the office was within the contemplation of law continuously operated night and day." And Circuit Judge Warrington posed, in United States v. Grand Rapids & I. R. Co., 6 Cir., 224 F. 667, 672, this rhetorical question: "Can it be doubted, for example, that offices are 'continuously operated night and day,' within the true intendment of the statute, wherever the same or similar and substantial lengths of service recur therein regularly every day and night for a series of successive 24-hour periods, even though the offices are not operated continuously 'during every hour from midnight to midnight?' Is not the word 'continuously' thus given due effect?"

It is only fair to state, however, as Judge Coleman (citing cases) pointed out in his opinion, that a number of federal judges, on the specific question, have adopted quite narrow, and sometimes even rigid, viewpoints.

### In General.

It is well settled that the Act is a remedial statute designed to encompass the public safety, which ought to be (and theoretically, is) the supreme law. Accordingly, the Act is entitled to a liberal interpretation, particularly when this will tend to subserve, rather than defeat, the purpose of the Act. Said Mr. Justice McReynolds in the Alton case, (247 U.S. at pages 199, 200, 38 S.Ct. at page 443, 62 L.Ed. 1066): "The purpose of the statute is to promote safety in operating trains by preventing the excessive mental and physical strain which usually results from remaining too long at an exacting task. * * * It must be construed and applied in view of that purpose and well-known circumstances attending the practical operation of trains."

In oral argument before us, counsel for B. & O. expressed grave fears lest a reversal by us of the decision below might lead to an inclusion of great numbers of employees, hitherto thought to be excepted, under the provisions of the Act. It was even said that a reversal might bring within the Act high officials of railroads, who, sometimes on occasions, give general train orders over the telephone or telegraph. We have no such intention. Nor do we even hold that yardmasters generally come within the Act. This is a border-line case, not free from doubt and difficulty, that lights the outer edge of the ambit of the Act. We decide, and decide only, that these extra yardmasters here, on whom had been superimposed the duties of train dispatchers (which duties train dispatchers had formerly performed), come within the purview of the Act, as we think the Act should be interpreted.

Finally, we think it is not without significance that the present action was instigated by the Interstate Commerce Commission as a manifestation of what that great administrative tribunal duly considers a wise public policy. That fact, though not in itself binding upon us, possesses nevertheless strong persuasive influence.

The judgment of the District Court is reversed.

Reversed.